## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-03290-CNS-MDB

PALMER NORTH AMERICA LLC,

      Plaintiff,

v.

WANZEK CONSTRUCTION, INC., and
MASTEC, INC.,

      Defendants.

_____

WANZEK CONSTRUCTION, INC.,

      Counterclaim Plaintiff,

v.

PALMER NORTH AMERICA LLC; CF&I STEEL, L.P. d/b/a EVRAZ ROCKY MOUNTAIN STEEL, a Delaware limited partnership; SOUTHERN INDUSTRIAL CONTRACTORS, L.L.C., a Louisiana limited liability company; WESTERN OILFIELDS SUPPLY COMPANY dba RAIN FOR RENT, a Delaware corporation; PENHALL COMPANY, a California corporation; J.D. STEEL CO., INC., an Arizona corporation; ACTION READY MIX, LLC, a Colorado limited liability company; WAGNER EQUIPMENT CO. a/d/b/a WAGNER RENTS, INC., a Colorado corporation; AVIATION SERVICE SUPPLY COMPANY d/b/a AIS INDUSTRIAL & CONSTRUCTION SUPPLY, a Colorado corporation; RMD KWIKFORM, NA, a Delaware corporation; FLOW RIGHT PLUMBING HEATING & IRRIGATION, INC. through its controlled subsidiary, FRPHI COMMERCIAL CONTRACTING, INC., a Colorado corporation; CMC STEEL FABRICATORS d/b/a CMC REBAR, a Delaware corporation; CORE & MAIN LP, a Florida Limited Partnership; CITY OF

PUEBLO, COLORADO, a Colorado Municipal Corporation; and DOUGLAS NAYLON as PUBLIC TRUSTEE OF PUEBLO COUNTY, COLORADO,

      Counterclaim Defendants.

_____

WANZEK CONSTRUCTION, INC.,

      Third-Party Plaintiff,

v.

EVRAZ NORTH AMERICA PLC,

      Third-Party Defendant.

---

## WANZEK CONSTRUCTION, INC.'S FIRST AMENDED COUNTERCLAIMS

Defendant Wanzek Construction, Inc. ("Wanzek"), by and through undersigned counsel, hereby files its First Amended Counterclaims and pleads the following Amended Counterclaims, as follows:[1]

### COUNTERCLAIMS

Defendant and Counterclaimant Wanzek Construction, Inc. ("Wanzek"), by and through undersigned counsel, by way of Counterclaims against Plaintiff, Palmer North America LLC ("Palmer" or "Owner"), alleges as follows:

    1.    This Action arises from a $300-plus million contract executed between Wanzek and Palmer on May 14, 2021 (the "Contract") under which Wanzek agreed to build a rail

---

[1] Pursuant to the Honorable Maritza Dominguez Braswell's June 21, 2023 Minute Order (ECF 75), Wanzek files a clean copy of its First Amended Counterclaims. On June 30, 2023, Wanzek filed a partial motion to dismiss Counts IV and V of Palmer's Second Amended Complaint (ECF 77). The filing of a partial motion to dismiss suspends the time to answer the remaining new counts. *See Bd. of Cnty. Comm'rs v. Brown Grp. Retail, Inc.,* No. 09-cv-00855, 2008 WL 4527736 (D. Colo. Oct. 3, 2008).

service center and a rail weld line, and to expand a rail rolling mill at Palmer's steel mill site in Pueblo, Colorado (the "Project"). Palmer uses the site to process scrap metal and other materials to make train rails and other manufactured steel items. The expansion of existing facilities and construction of new facilities by Wanzek was expected to allow Palmer to significantly increase its capacity to process metal and to fabricate 100 meter (~328 feet) long train rails that would be welded together to produce one-quarter mile long rail that Palmer can ship throughout the country.

2.      Under the Contract, Palmer had several fundamental obligations upon which the Contract's price and schedule were based. Palmer was required to provide Wanzek with access to the site and an area to stage equipment and materials for construction. Palmer was also required to provide Wanzek with the design and engineering for the Project to enable construction of the Project, and Palmer was required to pay Wanzek for the Work.

3.      As more fully set forth below, Palmer failed to fulfill its fundamental contractual obligations making it all but impossible for Wanzek to substantially perform its own obligations under the Contract.

i.      Palmer represented during the bid phase of the Project that its design would be complete by November 2021, and even went so far as to describe that date as a "line in the sand." Wanzek reasonably relied on Palmer's representations concerning the status of the design and the timeline in which Palmer would release the final design. Wanzek's price and schedule for the Work were based on Palmer's representations concerning the design and engineering. Despite Palmer's express representations that it would timely finish its design to enable construction

2

to progress, Palmer never met its design deadlines and in fact the design remained incomplete as of Palmer's termination of Wanzek.

ii.     Palmer continued to change the design documents that it issued either to add more work or correct errors or omissions in the design documents.  Indeed, Palmer ordered extensive additional work to a degree never contemplated by the Contract nor consistent with Palmer's express representations by issuing thousands of new or revised design drawings after November 2021.

iii.    During the Project, Wanzek repeatedly raised concerns about the incomplete design with Palmer Project personnel and upper-level management.  Palmer represented to Wanzek that it would complete its design to mitigate further delay.  However, in reality, Palmer never met any of its deadlines.  Palmer misrepresented to Wanzek the status of the design and Palmer's intention to complete the design apparently so as to induce Wanzek to continue performance.

iv.     Palmer turned over the site to Wanzek later than required under the Contract.  When Palmer finally did turn over the site, it quickly became apparent that Palmer's site preparation contractor did not adequately prepare the site.  Wanzek had to move over 70,000 cubic yards of earth before Wanzek could start construction.

v.      Despite delaying and disrupting Wanzek's work and ordering Wanzek to perform additional work, Palmer steadfastly refused to pay Wanzek for the ensuing increased costs.  Palmer withheld contractually

3

owed milestone payments for no reasoned basis; Palmer refused to acknowledge the increased costs associated with its directing of additional Work; Palmer refused to compensate Wanzek for Palmer's failure to issue a design in a timely manner and failure to release a design that meets the appropriate standard of care; Palmer failed to meet its basic obligations concerning the adequacy of the site; and Palmer refused to recognize the schedule impact that its breaches have caused Wanzek.

4.     The consequences of Palmer's misrepresentations about the status of its design and other material breaches of its fundamental contractual obligations were extreme. Under the Contract, the Project was to be complete by February 10, 2023, but due to the Owner-caused delays, disruptions, and Changes to the Work, as of December 31, 2022, the Project was just 48% complete. Under the current conditions, Wanzek projected that the Project would not reach final completion until February 2024. In addition, Project costs soared. Wanzek estimated that the costs to complete the Project under current conditions would more than double, increasing from a Contract Price of approximately $302 million to over $600 million. Wanzek incurred over tens of millions in additional costs.

5.     Wanzek repeatedly explained to Palmer the obstacles the Project faced due to the incomplete design and other breaches of the Contract. Palmer promised in meetings that it would address the design issues and compensate Wanzek fairly. However, in reality Palmer continually failed to fulfill its promises and refused to accept any responsibility for the Project delays and rising costs, and failed to limit the damages it caused by issuing a completed design.

6.      Palmer's failure to perform and refusal to pay Wanzek even a portion of its additional costs to date due to Palmer-caused impacts was a wrongful attempt to require Wanzek to finance the Project's significant increased costs, which was not contemplated by the Contract.

7.      However, if Wanzek attempted to limit the financial exposure by exercising its contractual right to stop the work because of Palmer's repeated material breaches of the Contract (without a declaration from this Court permitting Wanzek to do so), Wanzek risked significant financial and reputational harm, including potential termination of the Contract and an argument that the Contract's limitations of liability were void.

8.      Palmer's actions and refusal to accept any responsibility for its delayed engineering and design and its purported bases to not pay Wanzek any of its increased costs incurred to date caused Wanzek concern as to whether Palmer was even capable of compensating Wanzek for its Work.

9.      Wanzek's concerns about Palmer's ability to pay for the Work were heightened by recent world events that transpired after Wanzek entered into the Contract.  Palmer is a wholly owned subsidiary of Evraz North America Plc ("Evraz NA").  Evraz NA is an affiliate or wholly owned subsidiary of Evraz Plc, which is the subject of certain sanctions due to events in the Ukraine.  Wanzek was concerned that such developments would affect the ability of Palmer and the Guarantor to pay an additional $300 million potential increase in the Contract Price.

10.      Evraz Plc also publicly stated its intent to sell off its North American assets, including its Rocky Mountain Steel Mill site upon which the Project sits.

11.      The above developments and possible sale of Evraz Plc's North American assets caused Wanzek to be concerned about whether it would be paid for the Work it was performing.

12.     Given Wanzek's concerns about payment, on two separate occasions, Wanzek requested that Palmer provide it with adequate assurances that it can actually pay Wanzek the over $424 million in the original Contract Price as adjusted by approved and submitted change orders, let alone the $600 million that Wanzek estimated it would cost to complete the Work. Palmer did not provide any adequate assurances, such as contemporaneous financial data, that it could pay for the work it directed Wanzek to perform.  As a consequence, Wanzek was forced to finance millions of dollars of the Project.

13.     Given Palmer's on-going material breaches of the Contract, on November 29, 2022, Wanzek issued a notice to Palmer demanding that it cure its material breaches of the Contract ("Cure Notice").

14.     Palmer provided no response to Wanzek's Cure Notice and did not show any willingness to rectify its failures to comply with its contractual obligations and cure its material breaches of the Contract.

15.     Palmer also failed to adequately assure Wanzek that it could pay all of the costs that Wanzek estimated it would take to complete the Project due to Palmer-caused delays, disruptions, and Changes to the Work.

16.     Rather than attempt to cure its material breaches of the Contract, shortly after receiving Wanzek's Cure Notice, Palmer removed its Vice President and point of contact with Wanzek.  Then, on December 21, 2022, Palmer issued a retaliatory Notice of Default to Wanzek and demanded that Wanzek cure the alleged events of default within ten days.  Making matters worse, Palmer's Notice of Default failed to identify with any specificity the items Palmer desired Wanzek to cure, thus prejudicing Wanzek's ability to cure the alleged defaults.  This thinly veiled attempt to obfuscate its own failures was done in bad faith, without merit, and detached

from the realities of the Project. The timing of the Notice of Default alone—twenty-two days after Wanzek issued its Cure Notice for legitimate and well documented Palmer material breaches— revealed Palmer's true intent.

17.     Despite the mandated cure period in the Contract, also on December 21, 2022, Palmer initiated this action against Wanzek.  Palmer took the position that Wanzek failed and refused to cure its breaches of the Contract although Palmer initiated this action just hours after Palmer provided the Notice of Default to Wanzek, choosing gamesmanship over attempting to productively advance the Project and take accountability for its failed obligations.

18.     Notwithstanding the lack of detail provided by Palmer, Wanzek responded to Palmer's Notice of Default on December 26, 2022.

19.     Wanzek described the specific action(s) it had already taken and began implementing moving forward to cure or commence cure of each of the items in Palmer's Notice of Default.

20.     It is now clear, however, that Palmer had made up its mind to terminate Wanzek regardless of Wanzek's efforts to cure or commence cure of the alleged defaults.  In the days after Palmer issued its Notice of Default, Palmer's personnel removed Wanzek's security personnel from the Project site and advised that Palmer no longer had a contract with Wanzek. Palmer personnel also advised that Wanzek was not allowed back onto the Project site.  Palmer undertook these actions during the contractually permitted cure period.

21.     Moreover, Palmer relied on the very same allegations in its Complaint that it identified in its Notice of Default and that Palmer alleges Wanzek failed and refused to cure. Palmer went as far as to attach its Notice of Default to its Complaint.

22.     On the morning of December 31, 2022, contrary to the Contract's notice and cure provision, Palmer issued its written notice of termination of the Contract although its actions suggested it had already terminated the Contract.

23.     Palmer's termination notice relied on the exact same allegations cited in Palmer's December 21, 2022 Notice of Default.

24.     In doing so, Palmer ignored the Contract's prohibition on termination if Wanzek cured or commenced cure as set forth in the Contract.

25.     Wanzek has reason to believe that at the same time Palmer was requiring Wanzek to shoulder the financial burden to try and overcome the Palmer-caused obstacles, Palmer was negotiating with another contractor to complete the work in an attempt to avoid its financial obligations to Wanzek.  Upon information and belief, Palmer still has not hired a replacement contractor to recommence work on the Project.

26.     Wanzek suffered more harm with each day that passed because Palmer attempted to hold Wanzek financially responsible for the Project delays and costs to complete the Project that arose due to Palmer-caused impacts.  Wanzek seeks a speedy hearing pursuant to Fed. R. Civ. P. 57 and declarations of Wanzek's and Palmer's respective rights and obligations under the Contract.  More specifically, Wanzek seeks declarations that: (a) Palmer materially breached the Contract; and (b) under the Contract, Wanzek was entitled to immediately stop the work and, if necessary, terminate the Contract pursuant to Section 29.4 of the Contract.  Wanzek also brings counterclaims for breach of contract seeking compensation for the additional costs that Wanzek has incurred due to Palmer's defaults and subsequent wrongful termination of Wanzek.

## I.      PARTIES, JURISDICTION, AND VENUE

27.      Wanzek is incorporated in North Dakota with its principal place of business at 4850 32nd Ave. S, Fargo, ND 58105 and thus for purposes of diversity jurisdiction is deemed a citizen of North Dakota.

28.      Palmer is a Delaware limited liability company with its headquarters located at 71 S. Wacker Drive, Suite 1700, Chicago, IL 60606.  Upon information and belief, Palmer is a wholly owned subsidiary of Evraz NA.  Evraz NA is a corporation that is incorporated in the United Kingdom.  Thus, for the purposes of diversity jurisdiction Palmer is deemed a citizen the United Kingdom.

29.      Counterclaim Defendant CF&I Steel, L.P. d/b/a Evraz Rocky Mountain Steel ("CF&I") is the owner or reputed owner of the real property known by street addresses as 2100 South Freeway, Pueblo, Colorado 81004 and 100 Harlem Street, Pueblo, Colorado 81004 (the "Property").  CF&I is a limited partnership organized and existing pursuant to the laws of the state of Delaware with its principal place of business located at 1612 East Abriendo Avenue, Pueblo, Colorado 81004.

30.      Counterclaim Defendant Southern Industrial Contractors, L.L.C. is a limited liability company organized and existing pursuant to the laws of the state of Louisiana with its principal place of business located at 158 Industrial Loop, Rayville, Louisiana 71269.

31.      Counterclaim Defendant Western Oilfields Supply Company d/b/a Rain for Rent is a corporation organized and existing pursuant to the laws of the state of Delaware, with its principal place of business located at 3404 State Road, Bakersfield, California 93308.

32.     Counterclaim Defendant Penhall Company is a corporation organized and existing pursuant to the laws of the state of California with its principal place of business located at 7501 Esters Boulevard, Suite 150, Irving, Texas 75063.

33.     Counterclaim Defendant J.D. Steel CO, Inc. is a corporation organized and existing pursuant to the laws of the state of Arizona with its principal place of business located at 2101 W. Jackson Street, Phoenix, Arizona 85009.

34.     Counterclaim Defendant Action Ready Mix is a limited liability company organized and existing pursuant to the laws of the state of Colorado with its principal place of business located at 2650 Delta Drive, Colorado Springs, Colorado 80910.

35.     Counterclaim Defendant Wagner Equipment Co. a/d/b/a Wagner Rents, Inc. is a corporation organized and existing pursuant to the laws of the state of Colorado with its principal place of business located at 18000 Smith Road, Aurora, Colorado 80011.

36.     Counterclaim Defendant Aviation Service Supply Company d/b/a AIS Industrial & Construction Supply is a corporation organized and existing pursuant to the laws of the state of Colorado with its principal place of business located at 3900 Ulster Street, Denver, Colorado 80207.

37.     Counterclaim Defendant RMD Kwikform, NA, on information and belief, is an entity also known as RMD Kwikform North America Inc., a corporation organized and existing pursuant to the laws of the state of Delaware with its principal place of business located at 9351 Grant Street, Suite 200, Thornton, Colorado 80229.

38.     Counterclaim Defendant Flow Right Plumbing Heating & Irrigation, Inc., acting through its controlled subsidiary, FRPHI Commercial Contracting, Inc., is a corporation

organized and existing pursuant to the laws of the state of Colorado with its principal place of business located at 2406 W 11th St, Pueblo, Colorado, 81003.

39.     Counterclaim Defendant CMC Steel Fabricators d/b/a CMC Rebar, on information and belief, is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 6565 N. MacArthur Blvd., Irving, Texas 75039, and an office in Colorado at 5353 Franklin St., Denver, Colorado 80216.

40.     Counterclaim Defendant Core & Main LP is a Florida limited partnership with its principal place of business located at 1830 Craig Park Court, St. Louis, Missouri 63146.

41.     Counterclaim Defendant City of Pueblo, Colorado is a municipal corporation organized and existing under the laws of the state of Colorado with its principal place of business located at One City Hall Place, Pueblo, Colorado 81003.

42.     Counterclaim Defendant Douglas Naylon is the Public Trustee of Pueblo County, Colorado ("Public Trustee"), with a principal place of business located at 215 W 10th Street, Room 110, Pueblo, Colorado 81003.

43.     Wanzek also names as a Counterclaim Defendant each and every unknown person who claim any interest in the subject matter of this action by virtue of a currently unknown ownership interest in the Property or who may claim a valid lien or encumbrance against the Property after filing of this action.

44.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

45.     The Project that is the subject of this dispute is located in Pueblo, Colorado and a substantial part of the events giving rise to Wanzek's counterclaims arose there. Accordingly, and pursuant to 28 U.S.C. § 1391, venue is proper in this District.

## II.     GOVERNING LAW

46.     The Contract provides that it "shall in all respects be governed by and construed in accordance with the laws of the State of Colorado, including with respect to all matters of construction, validity and performance, without giving effect to any choice of law rules thereof which may direct the application of the laws of another jurisdiction."  Accordingly, Colorado law governs the Contract.

## III.    STATEMENT OF FACTS

47.     Palmer hired Wanzek to construct a rail rolling mill, rail service center, and weld line at Palmer's steel mill site in Pueblo.  The new and upgraded facilities were intended to substantially increase Palmer's capacity for processing scrap metals and fabricating both short and long track rails that Palmer can then ship throughout the country.  The basic layout of the Project site is provided below:

## Site Logistics Map



48.     On May 14, 2021, Palmer and Wanzek executed the Contract, whereby Wanzek agreed to provide certain construction services in exchange for a Contract Price of $302,184,932, as subject to adjustment in accordance with the terms of the Contract.  Palmer is in possession of a copy of the complete Contract.

49.     The Contract described in detail, among other things, the Project Schedule, the parties' roles and responsibilities, and the manner in which Wanzek would be compensated for the Work, including for Changes, delays, or disruptions to the Work.

50.     Wanzek was to achieve Final Mechanical Completion by February 10, 2023. *See* Contract, § 19.1.

51.     Under the Contract, Palmer was responsible for the engineering and design of the Project.  *See* Contract, §§ 2.3; 3.4.  As part of the bid process and as memorialized in the

Contract, Palmer provided a detailed preliminary design to Wanzek that encompassed hundreds of drawings and thousands of different line items of Work encompassed by Palmer's design. Further, because a completed design was necessary for construction, the Contract provided a detailed schedule that set out the dates by when Palmer's engineer, JNE Consulting and Engineering Delaware PA ("JNE"), was required to release Issued-for-Construction ("IFC") drawings. The IFCs were intended to be released in tranches that related to various scopes of work, e.g., deep and concrete foundations, electrical, miscellaneous steel, and piping.

52.     In the final stages of the bid process, Palmer released Addendum 8 to the Request for Proposal (RFP). Addendum Number 8 included substantial revisions to the already detailed design and revised dates for the IFC releases. Given the importance of certainty associated with the design assumptions (cost and schedule) underlying its bid, Wanzek sought assurances that it had the final design documents and design schedule. Palmer represented to Wanzek that the "Addendum #8 Dates are the line in the sand for document finalization." Palmer even assured Wanzek that it was operating in "good faith" in setting forth these dates.

53.     Under the Contract as clarified by Addendum Number 8, Palmer represented that the design would be finalized and released by November 2021.

54.     The Contract provides that the Contract Price consists of four compensation components:

      i.     Component 1: Direct Field Labor and Subcontract Cost

      ii.     Component 2: Permanent Plant Material and Specialty Subcontractor Cost

      iii.     Component 3: Fixed Sum for Indirect Costs

      iv.     Component 4: Fixed Fee

55. The Direct Field Labor and Subcontract Costs under Component 1 were primarily based on unit prices. Prior to execution of the Contract, Palmer identified different units of work and set forth the quantities for each such unit. For example, for concrete work, Palmer identified, among other things, the type and size of all anchor bolts, the type and amount of waterproofing and insulation material, and the amount of concrete that would need to be poured. Based on Palmer's estimates, Wanzek provided a unit rate price for each unit of the work. These units of work were also referred to as pay items. Palmer's RFP included 3,631 individual pay items based on the various scopes of work.

56. The initial pricing for Component 1 contained in Wanzek's bid used the proposed unit price for a particular scope of work and multiplied it by the Palmer-furnished quantities derived from the Owner-furnished Issued-for-Bid (IFB) drawings. As Palmer released IFC drawings, the pricing would be updated using the existing unit rates based on adjustments to the quantities of the work for each pay item.

57. The Direct Field Labor and Subcontract Costs under Component 1 were costs tied to the performance of construction work, like demolition, site preparation, erection, and installation.

58. Component 2 referred to the costs for certain materials that would be permanently installed at the Project and certain subcontractors who would be performing specialty work like painting, deep foundations, fabrication of pre-engineered metal buildings, and fire protection as expressly defined in the Contract. Wanzek was paid under Component 2 on a cost plus an additional percentage.

59. Component 3 referred to Wanzek's Indirect costs—a broad category made up of equipment, materials, field staff and indirect support personnel, and other items that are all

critical to supporting the construction of the Project.  The Indirect costs include all expenses necessary to complete the Project, such as preparation of laydown and storage areas, mobilization of personnel and labor, temporary facilities and equipment, sanitary stations, and small tools and consumable or safety supplies.  The Contract provides an Indirect Milestone Payments schedule that provides for payment of Indirect costs to Wanzek on a monthly basis.  Wanzek based the pricing for its monthly Indirect costs in large part on Palmer's representations during the RFP phase that it would finish its design by November 2021, and a February 2023 final completion date.  Component 4 was a fixed fee for Wanzek to perform the Work and is a factor of the costs under Components one through three.

60.     Various provisions of the Contract allowed Wanzek to seek additional compensation under each of the four compensation components.  *See* Contract, Appendix 2.

61.     The Contract also permitted Wanzek to seek additional costs and time for delays or disruptions to its Work, and to submit change proposals seeking additional costs and time for Changes to the Work for which Wanzek was not responsible.  *See* Contract, Arts. 21, 23.

62.     The Contract also granted Wanzek the express right to stop the work or terminate the Contract under certain circumstances.  As described in Section 29.4(a) of the Contract, Wanzek may stop the Work if, through no fault of Wanzek:

> (1) the Work is suspended for more than ninety (90) consecutive days by Owner or under an order of court or other public authority, or
>
> (2) Owner fails for forty-five (45) days after the due date to pay Contractor any undisputed sum finally determined to be due, or
>
> (3) there is an occurrence of one or more Owner Event of Default which has not been cured within the specified cure periods.

63.     Section 29.4(b) of the Contract further defines an Owner Event of Default. Notably, an Owner Event of Default includes those situations, among others, where Owner:

(A) voluntarily commences bankruptcy, insolvency, reorganization (other than solvent reorganization), stay, moratorium or similar debtor-relief or business  rescue proceedings, or shall have become insolvent or is unable to pay its debts as they become due, or admits in writing its inability to pay its debts or makes an assignment for the benefit of its creditors; or

[ . . .]

(D) is in material breach of any provision of this Agreement (other than those breaches specified in Section 29.4(a)(2) and Sections 29.4(b)(i)(A) to (C) above) and such breach is not cured by Owner within fifteen (15) days after notice thereof from Contractor; provided however that if such breach is not capable of being cured within such 15-day period, such a breach shall not be considered an Owner Event of Default if Owner commences to cure such breach within such 15-day period and thereafter diligently continues to cure such breach.

64.     Section 29.4(c) of the Contract granted Wanzek the express right to terminate the Contract if Palmer fails to cure its material breaches.

65.     The original Baseline Schedule segmented the Project into different areas (i.e., Rail Mill, Rail Service Center, Weld Plant) and used summary level activities to describe the work necessary to complete the required scope.

66.     Wanzek planned to begin on-site Work at the end of June 2021, starting with the most challenging areas and the areas that required the largest foundations or the most complex structures because those areas would take longer to complete.  As Work progressed, Wanzek planned to open additional work fronts across the Project site.  The planned sequencing would allow Wanzek to scale up its manpower over time and take advantage of the large Project site by methodically working multiple areas concurrently to achieve the required completion dates per the Contract.

67.     Under the Baseline Schedule, Palmer's engineering and procurement activities were to be complete before construction activities for a particular scope of Work would commence.

68.     Given that all design, engineering, and procurement for the Project needed to be complete before construction could commence, Palmer had to complete its design in sufficient time to allow Wanzek to plan for the execution of the Work and procure any necessary equipment, materials, and labor to perform the Work.

69.     Once the design was complete and all necessary equipment and materials were ordered and delivered, Wanzek had a straightforward plan to build the Project.

70.     During the RFP process in the spring of 2021, Palmer's RFP stated that Palmer would complete its design and issue all IFCs by November 2021.  This would allow Wanzek to begin its procurement activities and plan its work sequences such that it could achieve the milestone dates set out in the Contract.  Wanzek also based its schedule and pricing for the Work on the Owner's representations the design would be complete by November 2021.

71.     Moreover, as part of Addendum Number 8, Palmer represented to Wanzek that any additional Changes, if any, would be addressed through the Change Order process.

72.     Palmer's representations about its ability to meet the deadlines in Addendum Number 8 were false.  Even after the Contract was executed, Palmer repeatedly misrepresented to Wanzek the actual status of the design.  By November 2021, Palmer was nowhere near finished with its design and a substantial number of engineering deliverables were outstanding.  Wanzek made Palmer executives aware of the urgency of the situation and the need for Palmer to finish its design to allow construction to proceed as scheduled.  At that time, Palmer represented to Wanzek that it could complete its design by February 2022.  Based on this

representation, Wanzek resequenced its Work, adjusted procurement activities, and implemented other realignments to account for Palmer's new date to complete its design.

73.     By February 2022, Palmer's design remained incomplete, and it had failed to issue all IFCs and other engineering deliverables.  Palmer's design was already four months later than the time when it represented it would be complete during the bid phase.  Palmer then represented to Wanzek that it could complete the design by April 2022.  Palmer failed to meet even this delayed promise.

74.     Palmer repeatedly misrepresented the status of its design and engineering and its intention to complete its design.  Wanzek made Palmer's executive team aware of the urgency to complete the design and the significant impacts and delays the Project faced.  Palmer's Project and management teams largely ignored Wanzek's pleas and promised to complete its design, but in reality, Palmer failed to take sufficient action to finish the design.  Instead, Palmer misrepresented the status of its design to induce Wanzek to continue performance to Wanzek's detriment.

75.     Over a year after when Palmer represented its design would be complete, Palmer's design was still incomplete and Wanzek did not have all of the design and engineering documents necessary to allow it to complete its construction activities and the designs that were issued were constantly changed by Palmer.

76.     The Project suffered due to Owner's inaccurate representations about the status of its design, and other significant issues and impacts that have delayed, disrupted, and interfered with Wanzek's Work as well as caused Wanzek to incur significant additional costs.  In some instances, Palmer prevented Wanzek from advancing construction of the Project because of

Palmer's various breaches of the Contract and failure to perform its fundamental contractual obligations.

77.     These included, but are by no means limited to, the following:

i.      **Engineering Delay and Design Revisions and Errors**.  Palmer failed to complete the Project's design by November 2021.  Over a year later, the design was still not complete, and Palmer issued thousands of new and revised drawings after November 2021.  Wanzek was forced to procure new materials and perform duplicative work because Palmer issued revisions after Wanzek already began installation.  Wanzek was forced to hire dozens of additional personnel to organize and identify the volume of changes, address the impacts to the Work, and seek clarifications when new and revised drawings conflict with already installed Work.  Wanzek notified Palmer as early as August 2021 that Palmer's incomplete design was causing delays in planning and progress of the Work.  In a January 2022 monthly report, Wanzek stated: "The largest contributing factors [to the delays in construction] have been the delay in Owner's Engineering deliverables [and] revisions of IFC drawings[.]"

ii.     **Conversion Packages/Pay Items**.  While some design changes were expected, Wanzek could never have anticipated the volume and type of changes.  This was particularly true given that the RFP included 3,631 individual pay items based on the various scopes of work and Palmer represented that its design was largely complete and would be finalized by November 2021.  Wanzek and Palmer needed to generate 1,223 new pay

20

items to capture the vast number of changes and additions to the Work for which no pay item existed in the Contract. Palmer issued IFC drawings that Wanzek assumed to be complete, only for Palmer to reissue new IFC drawings with unidentified changes. Palmer's failure to cloud or otherwise identify changes in the drawings further magnified the level of effort required by Wanzek to understand the changes, or lack thereof, on each drawing, and forced Wanzek to more than double its field engineering staff to understand Palmer's deficient design and engineering deliverables.

iii.     **Increased Warehousing Personnel**.    As shown on the Site Logistics Map dated April 1, 2021, over a month before the execution of the Contract, Palmer represented that a single lay-down area of 17 acres was sufficient to store and stage materials and equipment. Palmer assured Wanzek the single laydown area was adequate because Owner-Furnished Equipment would be delivered to the Project site in shipping containers that could be stacked to conserve space. Wanzek based its required personnel and Indirect costs to manage the laydown and storage area on Palmer's representations. In reality, Palmer's equipment arrived in small individual shipments, significantly increasing the number of shipments received, unloaded, unwrapped, visually inspected, and stored. In addition, Wanzek had to manage, organize, and maintain the material for significantly longer than intended because of Owner-caused delays. As a result, the planned single 17-acre laydown and storage area grew to six different laydown areas totaling over 100 acres. Wanzek had to hire dozens of additional warehouse

personnel and increased craft manpower to manage the intake and storage of the equipment, materials, and the additional laydown areas.

iv.     **Embedded Conduit**:  During the RFP phase, Palmer represented that there would be minimal embedded conduit on this Project.  Palmer made a last-minute design change to reroute much of the electrical work from cordial trays above ground to placing electrical wiring in conduit deep underground.  In Addendum 8, issued shortly before Contract execution, Palmer added 58,400 LF of embedded conduit to the bid package.  After execution of the Contract, the amount of embedded conduit on the Project increased from 58,400 LF to over 340,000 LF. Wanzek advised Owner of the severity of this design change in the November 2021 Monthly Report, where Wanzek stated: "The largest contributing factor [to construction being behind the overall planned percent complete] is the growth in embedded conduit. Embedded conduit quantities have increased over 450% from the estimated quantities provided by Owner's Engineer." The addition of over 280,000 LF of embedded conduit was a significant Change to the Work and had a major impact to the Project, including sequencing; civil works; concrete works; surveying; and ingress and egress to the site to avoid potentially damaging the conduit.

v.     **Failure to provide timely site access**.  The Baseline Schedule identified "Contractor Mobilization Start" on June 1, 2021, and a planned start of construction activities on June 28, 2021, Wanzek was not approved to mobilize to the site until July 19, 2021.

vi.    **Failure to perform necessary prerequisite activities**.  Palmer was required to turn over the site to Wanzek at the grade profiles identified in the drawings.  Palmer's site preparation contractor did not grade many areas to the correct elevation. To correct this issue, Wanzek needed its own civil subcontractor to perform over 70,000 cubic yards of Palmer's grading work, before Wanzek could commence its own planned construction activities.

vii.    **Unforeseen Subsurface Conditions**.  Shortly after Wanzek began its construction activities, it encountered unforeseen groundwater and other obstructions that prevented Wanzek from performing its excavation and piling work.  Wanzek was forced to change its planned execution for the piling work while it waited for Palmer to develop solutions for the unforeseen subsurface conditions in a particular area.

viii.    **Engineering Delay at the ECR 2**:  Wanzek discovered inaccuracies in Palmer's design for embedded conduit stub-ups that resulted in conduit being installed more than seven feet from the intended location.  To fix this issue required significant rework on Wanzek's part, and a new design from Palmer.  Palmer did not revise its design or issue new engineering drawings.

ix.    **Anchor Bolt Design Issues**:  Palmer failed to identify in its foundation drawings all locations that required anchor bolt embedments and sleeves.  Wanzek discovered this deficiency only when it attempted to pour certain concrete with embedded anchor bolts.  Palmer did not issue revised drawings, which forced Wanzek either to guess the locations where embedded anchor bolts are required, or to skip the embedments and pour

concrete to keep the Project moving while risking that Palmer would later require embedded anchor bolts in already poured concrete.

x.   **Electrical Equipment List**:   Palmer's various iterations of the electrical equipment list, which provided all of the electrical equipment for the Project, have contained errors and inaccuracies, or lack necessary information, forcing Wanzek to guess what theoretical equipment was required by Palmer's design.   The inaccurate electrical equipment list jeopardized timely start-up and commissioning because Wanzek and Palmer could not know if the system was complete.

xi.   **Cable and Termination Schedules**:   Cable and termination schedules are standard engineering deliverables that illustrate all of the power and control cable required to operate the Project, and the locations at which cables must be landed in all panels for power and controls and to facilitate Project turnover.   Palmer continually revised its cable schedule and did not issue a termination schedule.   Wanzek could not complete this critical electrical work without complete cable and termination schedules.

xii.   **Loop Drawings**:   Loop drawings contain all circuit information from the instrument to the very last terminal of the control panel and explain graphically the geography and architecture of the loop.   A typical loop diagram contains terminal numbers, wire colors, power supplies, energy sources (pneumatic vs. electrical), isolation points, safety settings, instrument range, interlocks, and locations of every terminal, instrument, and device.  The loop diagram is an essential tool for construction, checkout,

24

start-up, and maintenance of electrical/instrumentation systems.  Palmer refused to provide loop drawings, preventing Wanzek from finishing this critical electrical work.

xiii.   **Piping Line List**:  A piping line list provides information for all of the piping to be installed on the Project.  Palmer's piping line list was missing industry standard information, including: operating temperatures, design pressures, required test pressures, testing media requirements, and connection points. This information was required for hydro-testing, system walkdowns, and turnover to the start-up and commissioning team. Palmer did not provide this information or advise when Palmer planned to do so. Wanzek could not perform the piping Work for the Project until Palmer provided all necessary design and engineering information.

78.   Wanzek repeatedly raised its concerns and the resultant impacts to the Project with Palmer in numerous written notices and during countless meetings between Wanzek and Palmer.

79.   Despite Wanzek's constant efforts to illustrate for Palmer the issues facing Palmer, Wanzek, and the Project, Palmer failed to take any responsibility for its incomplete design and other breaches of the Contract and instead attempted to deflect responsibility by wrongly blaming Wanzek for the Project delays and escalating costs.

80.   On October 31, 2022, Wanzek submitted to Palmer a document titled "Summary of the Status of the Project and Additional Request for Compensation and Time" (the "October 31 Request").

81.     In the October 31 Request, Wanzek (i) detailed its estimated costs to complete the Project under the current conditions; (ii) provided an estimated date by when Wanzek could achieve Final Mechanical Completion under the current conditions; and (iii) summarized for Palmer the significant impacts to the Work that have resulted from Palmer's delays, disruptions, and design changes.

82.     Wanzek advised Palmer that given the Owner-caused delays, disruptions, and Changes to the Work, Wanzek estimated that under current conditions it would cost over $600 million, which is $300 million more than the Contract Price, to complete the Project.  Wanzek also estimated that it would achieve Final Mechanical Completion by February 15, 2024, a year later than the Contract specified.

83.     Wanzek also expressed concern as to whether Palmer could pay for the Work it was requiring Wanzek to perform.  Palmer failed to pay amounts due under the Contract and refused to pay Wanzek for the additional costs incurred due to its incomplete design and other breaches of the Contract.

84.     The Work was being performed at a steel mill affiliated with Palmer's parent company and Guarantor Evraz NA.  Evraz NA is a wholly owned subsidiary of Evraz Plc.

85.     Upon information and belief, recent world events appear to be having a negative financial impact on Evraz Plc and Evraz North America Plc.  Evraz Plc has publicly stated its intent to sell off its North American assets, including the steel mill upon which the Project sits.

86.     The recent world events and announced sale of Evraz Plc's North American assets, including the Rocky Mountain Steel Mill, caused Wanzek concern about Palmer's ability to pay for the Work.

87. Given these concerns, Wanzek requested that Palmer provide Wanzek with adequate financial assurances that Palmer has the financial health to pay for the remaining work Wanzek must perform to complete the Project.

88. In response, Palmer merely stated that it had the ability to pay amounts properly due under the Contract and provided no actual evidence of the ability to pay.

89. On November 17, 2022, Wanzek submitted two Change Proposals in which it sought payment of its additional Indirect costs, and an extension of the Baseline Schedule.

90. In Change Proposal 0033, Wanzek sought payment of its additional Indirect costs that it had incurred through October 2022. Wanzek incurred these additional Indirect costs in large part because of the significant Project impacts that Wanzek described in its October 31 Request. Wanzek illustrated the reasons why it had incurred additional Indirect costs, including, but not limited to:

> i. Mobilization of additional personnel, including field engineers, warehouse staff, and project management.
>
> ii. Purchase and retention of additional temporary equipment to perform the additional Work.
>
> iii. Purchase of additional temporary materials and supplies, and costs incurred to provide more services to account for the additional personnel and Work, like temporary electrical and sanitary services.

91. In Change Proposal 0034, Wanzek requested an extension to the Baseline Schedule, which would have adjusted the Mechanical Completion Date from February 10, 2023, to February 15, 2024. In support of Wanzek's request, Wanzek provided Palmer with a critical path schedule analysis that demonstrated that there had been 370 calendar days of delay, for which

Palmer is responsible for at least 323 calendar days of delay due to, among other things, the incomplete status of Palmer's design and engineering deliverables.

92.     Palmer rejected Wanzek's Change Proposals in their entirety and again refused to take any responsibility for its failure to perform its fundamental contractual obligations.

93.     Also on November 17, 2022, Wanzek provided Palmer with a renewed request for adequate assurances of payment.

94.     Palmer did not provide any adequate assurances, such as contemporaneous financial or accounting documentation, that showed it had the financial wherewithal to pay Wanzek over $600 million to complete this Project or even the $424 million in the original Contract Price as adjusted by approved changed orders and submitted change orders.

95.     Given Palmer's on-going material breaches of the Contract, on November 29, 2022, Wanzek issued a notice to Palmer demanding that it cure its material breaches of the Contract ("Cure Notice").

96.     Palmer was required to provide Wanzek with timely site access and Palmer was required to complete all necessary Work before Wanzek mobilized to the site.  Palmer was also required to provide a completed design and all engineering deliverables by November 2021. Finally, Palmer was required to pay for the Work.  Palmer's failure to perform its fundamental contractual obligations and pay Wanzek for the additional Work that it directed Wanzek to perform constitute material breaches of the Contract.

97.     Palmer provided no response to Wanzek's Cure Notice.  Palmer did not show any willingness to rectify its failures to comply with its contractual obligations and cure its material breaches of the Contract.

98.     Palmer also failed to adequately assure Wanzek that it could pay Wanzek over $600 million that Wanzek estimated it would take to complete the Project due to Palmer-caused delays, disruptions, and Changes to the Work.

99.     On December 21, 2022, Palmer issued a Notice of Default to Wanzek and demanded that Wanzek cure the alleged events of default.

100.     In many instances, Palmer's Notice of Default copied and pasted provisions from the Contract without explaining the alleged defaults.

101.     Palmer's Notice of Default also failed to identify specific items that it desired for Wanzek to cure.  The lack of specific details prejudiced Wanzek's ability to cure the alleged defaults.  Palmer's retaliatory Notice of Default was issued twenty-two days after Wanzek issued its Cure Notice, and without ever responding to Wanzek's Cure Notice or curing its own material breaches identified in the Cure Notice.

102.     In Palmer's December 21, 2022 Notice of Default, Palmer did not state that it was considering termination of the Contract.

103.     Making matters worse, Palmer issued its Notice of Default the day before the holiday break for the Project that had been agreed upon, scheduled, and well known for months. The break allowed the more than 800 skilled craftsmen to take time away from the Project from December 22, 2022 through January 2, 2023, for the holidays and New Year.  Palmer took advantage of the holiday break and issued its Notice of Default knowing that the craftsmen would be away from the Project site for nearly two weeks after Palmer issued its Notice of Default.  The timing of Palmer's Notice of Default was not made in good faith and further prejudiced Wanzek's ability to cure or commence cure of the alleged defaults.

104.    Despite the mandated cure period in the Contract, also on December 21, 2022, Palmer initiated this action against Wanzek, attaching its Notice of Default as an exhibit. Palmer alleged that Wanzek failed and refused to cure its breaches of the Contract despite that Palmer filed a Complaint just hours after Palmer provided the Notice of Default to Wanzek. Palmer's Complaint relied on many of the same allegations that Palmer alleged were events of Contractor default in its December 21, 2022 Notice of Default.

105.    On December 21, 2022, the same day that Palmer issued a Default Notice, Palmer personnel met with Wanzek personnel to discuss the financial consequences associated with Palmer's changing and late design.  It is now apparent that the meeting was a façade.  At the same time Palmer was meeting with Wanzek personnel, Palmer filed a Complaint in this Court.

106.    Just five days after Palmer's Notice of Default, on December 26, 2022, Wanzek issued a six-page response to Palmer's Notice of Default.  A true and correct copy of Wanzek's December 26, 2022 letter is attached hereto at Exhibit A.

107.    In Wanzek's December 26, 2022 letter, it described the specific action(s) it had already taken, would continue to take, and would implement moving forward to cure or commence cure of each of the items set forth in Palmer's Notice of Default.

108.    It is now clear that Palmer never intended to honor Wanzek's right under the Contract to cure or commence cure and had made up its mind to terminate Wanzek regardless of the efforts by Wanzek to cure or commence cure of the alleged defaults.  In the days between Palmer's Notice of Default and termination, Palmer personnel removed Wanzek security personnel from the Project site and advised that Palmer no longer had a contract with Wanzek.  Palmer personnel also denied site access and advised that Wanzek was not allowed back on the Project site.

109.    On December 29, 2022, Palmer responded to Wanzek's December 26, 2022 letter.  A true and correct copy of Palmer's December 29, 2022 letter is attached hereto as Exhibit B.

110.    In the December 29 letter, Palmer purported to provide additional information regarding Wanzek's alleged breaches.  Palmer's letter set forth new alleged events of default that did not appear in its December 21 Notice of Default.

111.    Also in the December 29 letter, Palmer advised Wanzek that "if Contractor does not cure all of its breaches to Owner's satisfaction by December 31, 2022 in accordance with Article 29.2 of the Contract, Owner will declare Contractor in default and proceed with termination."

112.    On December 30, 2022, Wanzek provided Palmer with a letter to which it attached an 83-page Recovery Schedule.

113.    On the morning of December 31, 2022, Palmer issued Wanzek a written notice stating "that the Contract is hereby immediately and irrevocably terminated.  (Articles 29.2(b))."  A true and correct copy of Wanzek's December 31, 2022 termination notice is attached hereto as Exhibit C.

114.    In Palmer's termination notice, it relied on the exact same alleged events of default that it used as the basis for its December 21 Notice of Default and to support its Complaint.

115.    Palmer terminated the Contract without giving Wanzek notice that Palmer was considering a termination of the Contract as required by the Contract.

116.    Palmer terminated the Contract without providing Wanzek the cure period as required by the Contract

117.    Palmer terminated the Contract even though Wanzek had cured or commenced cure of each alleged default in Palmer's Notice of Default within the cure period set forth in the Contract.

118.    Upon information and belief, Palmer has yet to hire a replacement contractor to complete the Work.

119.    By all appearances, Palmer wrongfully terminated the Contract with Wanzek in bad faith in an effort to buy time to allow Palmer's Engineer to finish the Project design for the replacement contractor and avoid paying Wanzek its increased costs due to Palmer-caused delays and other impacts.

120.    All conditions precedent to commencing this Action have been satisfied.

121.    In addition to the following Counterclaims for Relief, Wanzek is pursuing its Lien claims under Colorado law.  At the appropriate time, Wanzek will be pursuing in the appropriate court its foreclosure actions to perfect its lien rights.

## IV.    COUNTERCLAIMS FOR RELIEF

### FIRST COUNTERCLAIM FOR RELIEF
#### (Declaratory Judgment)

122.    Wanzek hereby incorporates by reference the averments in Paragraphs 1 through 106 as if fully set forth herein.

123.    The Contract set forth Palmer's fundamental contractual obligations upon which Wanzek and Palmer executed the Contract.

124.    Palmer failed to complete its design and provide Wanzek with all Owner-Furnished Drawings by November 2021 and committed other material breaches of the Contract.

125.    Wanzek could not perform its construction Work and complete the Project due to Owner's failure to provide a completed design and other material breaches of the Contract.

126.     Pursuant to Sections 15, 21, and 23, and Appendix 2 of the Contract, Palmer was obligated to grant Wanzek additional compensation and adjustments to the schedule if Wanzek's cost of or time for performance of its Work was impacted for reasons beyond Wanzek's control.  Palmer's payment to Wanzek for work performed and of its debts as they become due are fundamental obligations of the parties' Contract.

127.     Palmer failed to approve Wanzek's Change Proposals and pay Wanzek additional monies that Wanzek incurred due to Owner-caused delays, disruptions, interferences, and Changes to the Work.

128.     Palmer also failed to provide Wanzek with any contemporaneous financial or accounting information to reasonably assure Wanzek that Palmer could pay Wanzek over $600 million that Wanzek estimated it would take to complete the Project under the current conditions.

129.     The Contract permits Wanzek to suspend the Work and terminate the Contract if, among other things, Palmer cannot pay its debts as they become due, or if Palmer is in material breach of any provision of the Contract.

130.     An actual controversy exists regarding whether Palmer was in material breach of the Contract and whether Wanzek could immediately suspend the Work and, if necessary, terminate the Contract.

131.     Wanzek has a direct, substantial, and present interest in the parties' respective obligations under the Contract.

132.     The declarations sought will terminate some or all of the disputes and controversies giving rise to this proceeding.

133.     As a result, a declaratory judgment is both necessary and proper to set forth the rights and obligations that exist between the parties.

134.     As described above, the dire situation in which Wanzek was placed necessitates a speedy hearing to determine the parties' obligations under the Contract.

**WHEREFORE**, Wanzek respectfully requests that the Court enter judgment as follows:

a.      Declaring that Palmer materially breached the Contract;

b.      Declaring that, under the Contract, Wanzek was entitled to exercise its contractual right to stop the work and, if necessary, terminate the Contract immediately;

c.      Awarding Wanzek such other relief as the Court deems equitable and just under the circumstances.

## SECOND COUNTERCLAIM FOR RELIEF
### (Breach of Contract – Defaults by Palmer)

135.     Wanzek hereby incorporates by reference the averments in Paragraphs 1 through 134 as if fully set forth herein.

136.     The Contract is valid and enforceable.

137.     Pursuant to the Contract, Palmer was obligated to, among other things, timely provide Wanzek with site access, perform all required prerequisite work before site turnover, provide Wanzek with a complete design and provide all Owner-Furnished Drawings in accordance with the timing set out in the Contract, compensate Wanzek in accordance with the Compensation Components set forth in the Contract, act in good faith and not make false representations, and to grant Wanzek additional compensation and adjustments to the schedule if Wanzek's cost of or time for performance of its Work was impacted for reasons beyond Wanzek's control.

138.    On November 29, 2022, Wanzek issued to Palmer a Cure Notice in which it set forth Palmer's defaults under the Contract and demanded that Palmer cure the alleged defaults.  Palmer ignored Wanzek's Cure Notice.

139.    Palmer breached the Contract because it did not timely provide access to the site or complete all necessary pre-work before site turnover to Wanzek.

140.    Palmer breached the Contract because it did not complete its design or issue all Owner-Furnished Drawings by November 2021, and its design was not completed.

141.    Palmer breached the Contract because it failed to pay Wanzek amounts due and owing under the Compensation Components in accordance with the Contract.

142.    Palmer breached the Contract because it failed to grant Wanzek adjustments to the Contract Price and the Baseline Schedule to account for the increases in Wanzek's cost of and time for performance of its Work caused by Palmer's delays, disruptions, interferences, and Changes to the Work.

143.    As a result of Palmer's breaches of the Contract, Wanzek has suffered damages in excess of $75,000.

**WHEREFORE**, Counterclaimant Wanzek Construction, Inc. respectfully requests judgment in its favor and against Plaintiff-Counterclaim Defendant Palmer North America, LLC in an amount in excess of $75,000, as well as interest, attorneys' fees pursuant to Section 31.3 of the Contract, and costs as permitted by the Contract, and other such relief as the Court deems just and proper under the circumstances.

### THIRD COUNTERCLAIM FOR RELIEF
#### (Breach of Contract – Wrongful Termination by Palmer)

144.    Wanzek hereby incorporates by reference the averments in Paragraphs 1 through 143 as if fully set forth herein.

35

145.   The Contract is valid and enforceable.

146.   On December 21, 2022, Palmer issued to Wanzek a Notice of Default.

147.   On December 26, 2022, Wanzek responded to Palmer's December 21, 2022 letter.  In Wanzek's December 26, 2022 letter, it described the specific action(s) it had already taken, would continue to take, and would implement moving forward to cure or commence cure of each of the items set forth in Palmer's Notice of Default.

148.   On December 31, 2022, Palmer terminated the Contract.  Palmer's bases for terminating the Contract were the same bases it cited to in its December 21 letter and in support of its Complaint.

149.   Wanzek cured or commenced cure of each of the alleged defaults in Palmer's Notice of Default within the cure period set forth in the Contract.

150.   Palmer wrongfully terminated the Contract because it failed to give Wanzek notice that Palmer was considering a termination of the Contract as required by the Contract.

151.   Palmer wrongfully terminated the Contract because it failed to provide Wanzek with the cure period as set forth in the Contract.

152.   Palmer wrongfully terminated the Contract because it terminated the Contract although Wanzek cured or commenced cure of each alleged default in Palmer's Notice of Default within the cure period set forth in the Contract.

153.   As a result of Palmer's wrongful termination of the Contract, Palmer prevented Wanzek from completing its Work on the Project.

154.   As a result of Palmer's wrongful termination of the Contract, Wanzek is entitled to payment in full for the Work it performed in addition to the profits it would have made had it been allowed to complete the Project.

36

155.     As a result of Palmer's wrongful termination of the Contract, Wanzek has suffered damages in excess of $75,000.

156.     **WHEREFORE**, Counterclaimant Wanzek Construction, Inc. respectfully requests judgment in its favor and against Plaintiff-Counterclaim Defendant Palmer North America, LLC in an amount in excess of $75,000, as well as interest, attorneys' fees pursuant to Section 31.3 of the Contract, and costs as permitted by the Contract, and other such relief as the Court deems just and proper under the circumstances.

### FOURTH COUNTERCLAIM FOR RELIEF
**(Breach of the Duty of Good Faith and Fair Dealing)**

157.     Wanzek hereby incorporates by reference the averments in Paragraphs 1 through 156 as if fully set forth herein.

158.     The Contract is valid and enforceable.

159.     The Contract contained an implied duty of good faith and fair dealing that required Palmer to use its discretion and act in good faith in its performance and enforcement of the Contract and to effectuate the intentions of the parties and honor their reasonable expectations under the Contract.

160.     Palmer was required to act in good faith in exercising its discretion in performing its obligations under the Contract, including, among other things, by providing the Project design and promptly furnishing all data and deliverables as required under the Contract, not making false representations about the status of the Project design and engineering, timely responding to Wanzek's requests for information, compensating Wanzek in accordance with the Compensation Components set forth in the Contract, granting Wanzek additional compensation and adjustments to the schedule if Wanzek's cost of or time for performance of its Work was

impacted for reasons beyond Wanzek's control, affording Wanzek a realistic opportunity to cure alleged defaults, and properly exercising its termination rights in accordance with the Contract.

161.    Palmer breached its duty of good faith and fair dealing because it did not complete its design or issue all Owner-Furnished Drawings by November 2021 in accordance with the parties' reasonable expectations under the Contract, and its design remains incomplete.

162.    Palmer breached its duty of good faith and fair dealing because it did not promptly furnish Wanzek with information or timely respond to Wanzek's requests for information in accordance with the parties' reasonable expectations under the Contract.

163.    Palmer breached its duty of good faith and fair dealing because it failed to pay Wanzek amounts due and owing under the Compensation Components in accordance with the parties' reasonable expectations under the Contract.

164.    Palmer breached its duty of good faith and fair dealing because it failed to grant Wanzek adjustments to the Contract Price and the Baseline Schedule to account for the increases in Wanzek's cost of and time for performance of its Work caused by Palmer's delays, disruptions, interferences, and Changes to the Work in accordance with the parties' reasonable expectations under the Contract.

165.    Palmer breached its duty of good faith and fair dealing because it prematurely foreclosed Wanzek's right to cure or commence cure and wrongfully terminated the Contract contrary to the parties' reasonable expectations under the Contract.

166.    As a result of Palmer's breaches of its duty of good faith and fair dealing, Wanzek has suffered damages in excess of $75,000.

**WHEREFORE**, Counterclaimant Wanzek Construction, Inc. respectfully requests judgment in its favor and against Plaintiff-Counterclaim Defendant Palmer North America, LLC

in an amount in excess of $75,000, as well as interest, attorneys' fees pursuant to Section 31.3 of the Contract, and costs as permitted by the Contract, and other such relief as the Court deems just and proper under the circumstances.

## FIFTH COUNTERCLAIM FOR RELIEF
### (Lien Foreclosure Against All Counterclaim Defendants)

167.    Wanzek hereby incorporates by reference the averments in Paragraphs 1 through 166 as if fully set forth herein.

168.    All of the Property that is the subject of this action is necessary for the convenient use and occupation of the Project and related improvements for which Wanzek furnished labor, equipment, and/or materials.

169.    Palmer has failed to pay and owes Wanzek for labor, equipment, materials, subcontractors, and other services (collectively, the "Services") Wanzek provided to the Project situated on the Property.

170.    Wanzek claims an interest in the Property for the reasonable value of the lienable Services provided by it to the Project, but not paid for by Palmer, pursuant to Colorado's General Mechanic's Lien statute, §§ 38-22-101 to 38-22-133, C.R.S. (the "Lien Statute").

171.    On or about December 23, 2022, Wanzek properly served a Notice of Intent to File a Lien Statement in the amount of $76,807,728 at least 10 days before recording its Statement of Lien, in accordance with Section 109(3) of the Lien Statute.

172.    Wanzek subsequently recorded its Amended and Restated Statement of Mechanic's Lien and affidavits of service on January 6, 2023, as Instrument Number 2300975 in the official records of Pueblo County Clerk and Recorder, for the purpose of claiming a lien in the reduced amount of $64,637,663.92 on the Property in accordance with Section 109(1) of the Lien Statute.

173.     Wanzek further timely amended its lien amount in accordance with Section 109(6) of the Lien Statute, by recording a Second Amended Partial Release and Restatement of Mechanics Lien on April 20, 2023, as Instrument Number 2310264, claiming a lien amount of $64,222,426 (the "Lien").   A true and correct copy of Wanzek's operative Lien (as noticed, recorded, and amended) is attached hereto as Exhibit D and incorporated herein by reference.

174.     The above-named Counterclaim Defendants may also claim an interest in the Property by virtue of an instrument of record with the Clerk and Recorder of Pueblo County, State of Colorado.  A list identifying each Counterclaim Defendant, the interest in the Property claimed by such Counterclaim Defendant, the recording date of each instrument of record, along with the reception number, is attached hereto as Exhibit E and incorporated herein by reference.

175.     Contemporaneous with the filing of this Complaint, Wanzek is recording a Notice of Commencement of Action, or Lis Pendens, in the Clerk and Recorder's Office of the County of Pueblo, Colorado, in accordance with Section 110 of the Lien Statute.  A copy of the Notice of Lis Pendens is attached hereto as Exhibit F and incorporated herein by reference.

176.     Wanzek's Lien is a valid mechanic's lien on the Property and improvements thereon constructed pursuant to its Contract with Palmer in the amount of $64,222,426 plus interest, recording fees, foreclosure certificate and other costs.

177.     Wanzek has timely commenced this action within six months after the last work or labor was performed, or laborers or materials were furnished, for the Project situated on the Property, in accordance with Section 110 of the Lien Statute.

178.     Wanzek has complied with all statutory requirements in the Lien Statute for noticing, recording, and perfecting its Lien and noticing and commencing its claim for foreclosure of such Lien on the Property.

179.     Wanzek's Lien is equal or prior to any right, title, interest, or claim of all Counterclaim Defendants named herein in the Property or improvements thereon.

180.     Wanzek is entitled to foreclose on its Lien and sell the Property with the proceeds to be applied to pay Wanzek the amounts owed, together with pre- and post- judgment interest, costs, and other allowable fees and expenses.

**WHEREFORE**, Wanzek respectfully requests that the Court enter judgment as follows:

a.       Declaring that Wanzek possesses a valid Lien against the Property and improvements thereon;

b.       Declaring that Wanzek's Lien is equal or prior to any right, title, interest, or claim of any competing interest in the Property or improvements thereon;

c.       Foreclosure of Wanzek's Lien against the Property and an Order directing the Sheriff of the County of Pueblo, Colorado to sell the Property and/or improvements thereon, as necessary to satisfy Wanzek's Lien, including interest, costs, and other fees or expenses as permitted by the Lien Statute; and

d.       Judgment for court costs, interest pursuant to Section 101(5) of the Lien Statute and/or Section 5-12-101, et seq., C.R.S., as appropriate, attorney's fees pursuant to Section 31.3 of the Contract, and for such other and further relief as the Court deems proper.

Dated:      July 7, 2023                          Respectfully submitted,


                                                  */s/ Bret R. Gunnell*
                                                  Bret R. Gunnell (#24579)
                                                  Henry C. Bangert (#37909)
                                                  Beltzer Bangert and Gunnell LLP
                                                  5420 S. Quebec Street, Suite 103
                                                  Greenwood Village, CO 80111
                                                  Telephone: (720) 576-7225
                                                  E-mail: bret@bbglaw.com
                                                  E-mail: henry@bbglaw.com

                                                  Michael P. Subak (Admitted D. Colo)
                                                  Jamey B. Collidge (Admitted D. Colo)
                                                  3000 Two Logan Square
                                                  Eighteen and Arch Streets
                                                  Philadelphia, PA 19103
                                                  Telephone: (215) 981-4000
                                                  E-mail: Michael.Subak@troutman.com
                                                  E-mail: Jamey.Collidge@troutman.com

                                                  *Attorneys for Defendant, Counterclaimant, and*
                                                  *Third-Party Plaintiff Wanzek Construction, Inc.;*
                                                  *and Defendant MasTec, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2023, a true and correct copy of the foregoing was served on ALL COUNSEL OF RECORD through the court e-filing system.

_/s/ Laura Prince_
Laura Prince

# EXHIBIT A

# WANZEK

**SENT BY EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND UPLOADED INTO PROCORE**

December 26, 2022                                                                                      Notice 0171

Palmer North America, LLC
1612 East Abriendo Avenue
Pueblo, Colorado 81004
Attention: Matthew Perkins
Email:

**RE:     Wanzek Job # 1725**
**Palmer Rail Mill, Pueblo, Colorado (the "Project")**
**Response to Owner Notice PAL_WAN_LT-0209**

Dear Mr. Perkins:

We write in reference to the Construction Contract for the Project between Palmer North America, LLC ("**Owner**") and Wanzek Construction, Inc. ("**Contractor**") dated May 14, 2021 (the "**Agreement**").  Please note capitalized terms used but not defined herein have the meanings set forth in the Agreement. Contractor writes in response to Owner's Notice of Default dated December 21, 2022.

Contractor is surprised by the timing of Owner's Default Notice.  Owner's Notice follows months of efforts by Contractor to describe to Owner the significant impacts to the Project schedule and costs that have resulted from Owner-caused delays, disruptions, and Changes to the Work.  Owner's Notice also comes after the deadline for Owner's response to Contractor's November 29 Notice to Cure in which Contractor demanded that Owner cure its material breaches within 15 days as required by Section 29.4.  Contractor described in detail a number of specific design and engineering deliverables that Owner must issue to allow Contractor to continue its construction Work and mitigate delays to the Project.  Contractor has repeatedly reminded Owner of the need for a design so as to allow construction to proceed.  Owner has assured Contractor that it would compensate Contractor for the impacts suffered as well as take steps to rectify the situation with Owner's design.  And yet, rather than substantively respond to Contractor's Cure Notice or cure its material breaches, it appears Owner instead elected to respond with a retaliatory Default Notice and filing of a Complaint in federal court on the very same day.

Compounding matters, Owner could have issued its Default Notice (or even raised these concerns) at any time over the last several weeks, but instead waited until December 21, the eve of the holiday break for the Project.  As the Owner has known for months, the more than **800 skilled craftsmen** are on break from December 22 through January 2 for the holidays and New Year.  Owner also waited to issue its Default Notice until the day before Colorado would suffer some of the coldest temperatures and worst winter weather in decades, such that the Work likely could not be performed in any event.

In any event, the Agreement provides Contractor with the express right to cure any alleged breaches of the Agreement and please be assured that Contractor has reviewed in detail each of the allegations in the Default Notice and will be taking all reasonable steps to address Owner's concerns.  Where Owner has not provided sufficient detail, or is citing events that happened over a year ago, Contractor will focus on the subject matter raised (e.g., project management or quality).  Note, however, that by failing to identify specific items Owner desires that Contractor cure, Owner has prejudiced Contractor's ability to cure.

Nonetheless, Contractor remains committed to the terms of the Agreement, including its ability to address each of the four alleged "events of Contractor's default" below.

a MasTec company

1. Article 29.2 (i): Contractor's persistent failure to perform the Work in accordance with this Agreement (including failure to supply sufficient skilled workers or suitable materials or equipment, or failure to adhere to the Baseline Schedule)

In support of this allegation, Owner recites Section 3.1 of the Agreement. Owner provides no details concerning the alleged lack of skilled craft or suitable materials or equipment, or Contractor's alleged failure to adhere to the Baseline Schedule.

The subject of delay to the Project and how best to mitigate has been the subject of many meetings between Contractor and Owner. In Contractor Notice # 0150, Contractor provided Owner with a 58-page detailed critical path schedule analysis that allocated responsibility as between Owner and Contractor for the delays incurred to date and identified the schedule of activities going forward. Contractor has purchased materials and supplies that Owner should have purchased and added additional resources to keep this Project on schedule as much as possible under the circumstances. Contractor staffed and managed additional laydown areas when Owner's material supply program largely broke down because of design delays. Contractor supplied additional cranes and equipment to account for the revised design. Contractor has retained or subcontracted for more than 800 skilled workers across the Project and has taken multiple steps to recruit and retain necessary craft levels. Contractor will continue to take similar steps to mitigate any cost or schedule impacts on the Project.

2. Article 29.2 (v): (i) Contractor's failure to provide a Recovery Schedule as required pursuant to Section 20.1, or (ii) Contractor's failure, in Owner's reasonable opinion, to make required progress against a Recovery Schedule pursuant to Section 20.1(d)

Owner's claim that Contractor failed to provide a Recovery Schedule does not seem consistent with the facts surrounding Contractor's schedule efforts on the Project. Contractor described the methodical process that it would undertake to evaluate the Baseline Schedule in numerous letters, including Notice #s 0086, 0100, 0113, and 0119. In those Notices, Contractor made clear that to effectively plan for the remaining Work, confirm the critical path, and provide a Recovery Schedule, it was undertaking a comprehensive schedule reforecast based on current quantities, conditions, and other available information.

Contractor and Owner then worked closely together during this schedule evaluation and on September 13, Contractor provided Owner with a schedule reforecast that identified a date for Final Mechanical Completion in February 2024. Contractor also described a number of assumptions on which the schedule reforecast was based, including, of particular importance, that Owner would complete its design and provide a number of engineering deliverables. Owner did not substantively comment or object to Contractor's schedule reforecast.

However, during executive meetings, Owner recently requested that Contractor take steps to pull the forecasted completion date back to October 2023. Contractor again emphasized that to have a chance at achieving Owner's desired completion date, Owner must complete its design and provide all of the engineering deliverables that Contractor needs to perform its construction Work. Nonetheless, Contractor identified certain acceleration measures: adding a second shift, overlapping activities, and further increasing crew levels. Contractor continues to evaluate the schedule in an effort to identify changes so as to meet the October 2023 completion date. Contractor will provide Owner with a Recovery Schedule that aims for October 2023 Final Mechanical Completion date but Owner still must provide Contractor with a complete design, and any such Recovery Schedule will be subject to all of the assumptions Contractor previously described, including in Notice #0119.

3. Article 29.2 (ix): Failure of Contractor to perform or otherwise to comply with a material term of this Agreement

Owner provided "a sampling of Contract Articles setting out material terms of this Agreement to which Contractor is obligated to perform." Owner's recitation of the Agreement does not offer any facts that show

Contractor breached what Owner alleges are "material terms" of the Agreement. Contractor requests Owner to provide details concerning the alleged issues that Owner is citing. Failure to do so will prejudice Contractor's ability to address Owner's concerns. Contractor remains ready to address any specific items identified by Owner.

4. Article 29.3 (xi): Contractor's, Subcontractor's, or Supplier's repeated disregard of the authority of Owner or Owner's Representative

Contractor is confused by Owner's allegation that Contractor has shown a "repeated disregard" of Owner's authority. Contractor has always strived to abide by Owner's instruction during this Project and will continue to do so. Owner and Contractor have weekly meetings and extensive ongoing communications. In the past, Owner has requested that certain Contractor personnel be removed from the Project. At times, Contractor has agreed to do so for the best interest of the Project and at other times Contractor has raised concerns about the effects of such requests and Owner has retracted its request. For its part, Contractor has repeatedly raised concerns about the Owner's lead representative and believes that Owner's recent decision to have him removed from the Project will benefit all involved. If Owner has concerns about specific issues, it can raise its concerns contemporaneously with Contractor to allow Contractor an opportunity to address Owner's concerns.

Safety

Contractor views safety as the most important priority and stresses safety to the over 800 skilled craftsmen on this Project daily. Contractor has created and maintains an extensive safety program for this Project. As of December 17, 2022, there have been 2,012,040 total manhours worked, inclusive of all subcontractors. In over 2 million manhours worked, there have been zero Lost Time Accidents and a total of six Total Recordable Incidents as defined by OSHA, for a Total Recordable Incident Rate (TRIR) of 0.6. While Wanzek always strives for zero recordable incidents, Contractor's current TRIR reflects an extremely safe work environment that has been described as "best in class." Nonetheless, in the area of safety, one can always strive for improvement. Some of the steps that Contractor has taken are as follows:

1) Daily Plan of the Day (POD) meetings with supervision to coordinate activities and discuss real time safety & quality issues for the day, while marking up a general arrangement drawing for a visual of where everyone will be working that day.

2) Daily Tail Gate meetings with the entire crew and supervisor to discuss the day along with and relevant information that came out of the POD that may affect the crew and complete their JHA (Job Hazard Analysis)

3) Weekly All Hand Safety meetings to discuss trends and how we are going to mitigate them.

4) The Team has developed area POD boards to enable each craft worker to understand fully the relevant activities and associated hazards, if any.

5) Task specific tool training is required. Equipment operators are trained and carded for this Project.

6) We do just in time LOTO (Lock Out Tag Out) along with Confined Space training for all craft once the applicable hazard is present in the work at issue.

7) Every employee will be trained on the Jungle Gym before they are allowed to work at heights.

8) Recognizing the challenges associated with an English and Spanish speaking work force, all signage is bi-lingual and Contractor has retained qualified interpreters to make sure we provide a clear message

Going forward, in addition to the above, Contractor will be implementing additional daily and weekly training, especially as Contractor moves into new work fronts involving different disciplines of Work. Contractor will continue to employ bi-lingual messaging to ensure that all of the craft fully understand and appreciate the messages and training concerning safety. Contractor is confident that through such continued and invigorated efforts toward safety, the TRIR may be lowered even further.

Owner's claims that Wanzek has been unsafe are inconsistent with the facts. Owner relies on three incidents during the 18 months Contractor, each of which has been previously addressed. Nonetheless, Contractor will review each here again.

Breach of Mill Water Lines. Contractor in no way minimizes any safety issues on the Project, but this event occurred over a year ago. Contractor immediately addressed this incident by removing the responsible subcontractor employees, supervisors, and project manager associated with this incident. Contractor also adjusted its overall policies and procedures associated with close proximity excavations such that all existing lines must be visibly observed after hydro excavation was performed to prevent future incidents. Wanzek also provided extensive additional training with all personnel associated with excavations and provided such training during all future orientation trainings. No further similar events have taken place since.

100 Ton Crane Contact with a live High Voltage Line. Contrary to Owner's statement, the line that was contacted was the ground wire at the south laydown yard, not a high voltage line. This location was never intended to be used at the start of the Project and the Owner did not mark any warmings associated with the lines. Contractor has since insured that all such lines are marked. This incident certainly did not occur due to any disregard for Owner's authority and there have been no similar incidents since.

Violation of Owner, Contractor and OSHA Critical (High Consequent/High Value) Lift Requirements. Contrary to Owner's claims, the rigging for this lift was arranged in accordance with the manufacturer's recommendations on how to pick the piece of equipment. As the NCR stated, lifting equipment was applied to the container box as specified in the lifting plan. The NCR also states that all safety procedures and safe work practices were being followed. This incident is attributable to the weathered and worn crating in which the Owner-supplied equipment arrived at the site. In addition, the Owner's OEM vendor incorrectly marked the center of gravity on the crate. When the lifting crew experienced issues with the lift, the safety crew stepped in exactly as planned and developed a safe and effective plan to offload the piece of equipment. Wanzek's safety team operated as trained and developed a solution to safely offload this equipment despite the poor quality of the crate and the incorrect markings.

Management – Progress, Reporting, and Cooperation with Owner

As previously explained, Contractor has abided by the Agreement to progress the schedule and cooperate with the Owner as best that it can under the current conditions. Contractor will not repeat all of the numerous and significant impacts to the Project schedule and costs that have resulted from Owner-caused delays, disruptions, and Changes to the Work.

Again, Contractor provided Owner with a critical path schedule analysis that allocates responsibility for delay and forecasts a revised completion date. Contractor has stressed that the need for design deliverables in order to hold a schedule. Contractor renews its request that Owner enable Contractor meet with the Engineer to confirm all outstanding deliverables and the date on which the Engineer will release them.

Owner claims Contractor has not provided accurate reports on actual progress. Contractor believes that the progress reports are accurate when released. Note, the total earnable manhours for the Project have and will change when scope is added, as has been the case. Because Owner's design is changing, Contractor must constantly revise the conversion packages, altering the total manhours and thus the percent of progress. Owner's efforts to paint Contractor in default because it failed to progress the Work

or provide a Recovery Schedule do not appear well-founded but if Owner wishes to identify specifics associated with these statements, Contractor will investigate and respond as appropriate.

Quality

Owner's claims that Contractor has failed to perform the Work in accordance with the Agreement's Quality Plan and Contractor's own QAQC Manual do not appear correct.  Owner has pointed to the existence of Nonconformance Reports as a basis to support this claim.  Note, Nonconformance Reports are for craftsmanship that does not meet the required specifications for the Project when turned over to the Owner for Acceptance. In certain instances, Owner instructed Contractor to issue a Nonconformance Report before the Work was turned over, which Contractor did to foster a sound working relationship.  In hindsight, Contractor should not have done so as that has either created confusion concerning what constitutes an NCR or Owner has not issued NCR's consistent with the stated purpose.  When identified by Owner, Contractor has also made any repairs as necessary to ensure all construction complies with the requirements of the Agreement.  Owner does not identify instances where Contractor did not meet the quality standards, which makes it very difficult to implement any corrective measures.

As it relates to Corrective Action Reports, all Corrective Actions have been addressed.  The sole exception is CAR 10.  There, Contractor retained Terracon to serve as a second 3rd party for grout inspections.  On a project such as this one, the amount of welding is always a focus.  Here, in over 1000 pipe welds, each has achieved appropriate quality standards.  One weld on a splice plate for an H-pile was rejected and that was corrected.  This is a proven track record of quality.

Going forward and to address Owner's concerns, Contractor will continue to employ 14 dedicated full time Quality professionals, which is greater than normally expected on a project such as this but indicative of Contractor's commitment to quality, as well as at least four different 3rd party inspectors for discrete items (e.g., soils and concrete); Contractor will continue to meet daily with Palmer QC staff to review activities of the day; Contractor will continue its practice of quarterly quality audits, relying on the corporate expertise of Wanzek.  We will increase the frequency of these audits as we have found them to be quite beneficial.  Contractor will also add a daily meeting with Palmer staff to review concerns contemporaneously.  Contractor will continue to strive to achieve all quality requirements set forth in the Agreement.

Contractor has already addressed many of the issues Owner describes in its Notice of Default.  Contractor has continually worked with Owner at every stage of this Project to attempt to establish a realistic revised Project schedule based on current conditions.  Contractor has explained that it has and will make every attempt to meet Owner's desire for an October 2023 completion date, but to do so, Owner must take part in those efforts, cure its material breaches, and finish its design.

In response to Owner's Notice of Default, Contractor has initiated various measures to address safety, quality and safety.  Contractor will continue to do so and welcomes the opportunity to meet with the Owner to lay out each of these initiatives.  If Owner is serious about making this a successful Project, it needs to work with Contractor to identify all areas of improvement, including Schedule, so that we can have a realistic plan for completing the Project.

Notwithstanding anything contained in this letter, Contractor reserves all rights and remedies it is afforded under the Agreement, at law, and in equity and nothing herein limits the same.  Owner is further advised this letter does not purport to be, nor should it be viewed as constituting, an exhaustive identification of facts relating to Contractor's claim hereunder.

Thank you for your timely attention to this matter. Please contact the undersigned with any requests or questions.

Sincerely,

Michael McCurdy, Senior Project Manager FOR
Arnie Jelinek, Senior Vice President, Operations, Industrial
Wanzek Construction, Inc
Email: ajelinek@wanzek.com

Dist:

Palmer North America, LLC
71 S. Wacker Drive, Suite 1700
Chicago, Illinois 60606
Attention:  Eileen Tierney, General Counsel
Email:  Eileen.tierney@evrazna.com

Wanzek Construction, Inc.
4850 32nd Ave S
Fargo, ND 58104
Attention: Bill Bradley, Senior Project Manager
Email: bibradley@wanzek.com

Wanzek Construction, Inc.
4850 32nd Ave S
Fargo, ND 58105
Attention:  Mark Baumann, Vice President of Construction, Industrial
Email: mbaumann@wanzek.com

Wanzek Construction, Inc.
4850 32nd Ave S
Fargo, ND 58104
Attention:  Legal Department
Email:  legal@wanzek.com

# EXHIBIT B

**EVRAZ** | PALMER NORTH AMER

Thomas Young
Vice President Project Palmer
phone: (719) 5616551
email:  Thomas.Young@evrazna.com

**December 29, 2022**                                                      **PAL_WAN_LT-0213**

**Wanzek Construction Inc.**
c/o Michael McCurdy
Senior Project Manager
Wanzek Construction, Inc.
6446 S. Kenton St. Suite 100
Centennial, CO 80111

**Subject:**          Response to Notice #0171

**Contract:**         GC-01

Mr. McCurdy:

This responds to Wanzek Notice #171, dated December 26, 2022, in which Wanzek Construction, Inc. ("Contractor") purports to respond to Palmer North America, LLC's ("Owner") December 21, 2022 notice of Contractor's default of the parties' contract dated May 14, 2021 (the "Contract").

Contrary to Contractor's suggestion, there is nothing in Owner's notice of default that should be a surprise to Contractor.  In the weeks leading up to the Owner's December 21 notice of default, Contractor engaged in an aggressive campaign of blaming Owner for Contractor's delays and advancing a false narrative in a transparent attempt to avoid responsibility for its material breaches of the Contract.  For instance, on November 17, Contractor demanded immediate payment of the withheld Indirect Milestone Payments, ignoring entirely that the parties had reached an agreement on November 15 that Owner would release the Indirect Milestone Payments once Contractor met certain milestones, which had not been met by November 17.  After Owner pointed this out to Contractor, Contractor failed to respond or to withdraw its demand.  Instead, Contractor continued to demand payment for costs to which it was not entitled under the terms of the Contract and threatened to place liens on Owner's property for these disputed costs, all in breach of the Contract and its obligations of good faith and fair dealing.

Contractor has also submitted multiple improper Change Proposals seeking to alter the Baseline Schedule based on its unsupportable claim that its delays were due to Owner's engineering design.  As Contractor is well aware, and as Owner has explained on multiple occasions, the engineering design was substantially completed by February 2022 and,

perhaps more importantly, Owner completed and issued *all* design documents relevant to Contractor's scope of work.   In other words, the *only* outstanding designs are unrelated to -- and, thus, would not impact -- Contractor's ability to plan or meet its deadlines.   Thus, Contractor's delays are a result of its own failings.   Adding insult to injury, on November 29, Contractor issued a "Renewed Notice to Cure," even though Contractor had ***never previously issued any notice that it could supposedly "renew,"*** again trying to blame Owner for its delays and citing the disproven claim that Contractor required a complete engineering design.

While Owner had been optimistic that the parties would be able to resolve their outstanding issues through party-to-party negotiations, Contractor's ongoing and relentless attempts to manufacture blame for Owner where none exists -- all while ignoring each of Owner's detailed responses debunking Contractor's claims -- made clear that any further discussions between the parties would be futile.   As a result of that futility, Owner had no choice but to issue the December 21 Notice of Default.

While Owner acknowledges Contractor's representation in Notice #171 that it intends to cure its material breaches within the ten (10) day cure period set forth in the Contract, Notice #171 fails to provide any detailed plans indicating how Contractor intends to address its material breaches in that time period.   To the extent Contractor claims that it requires additional information regarding its breaches, Owner responds below.

1. **Article 29.2 (i): Contractor's persistent failure to perform the Work in accordance with this Agreement (including failure to supply sufficient skilled workers or suitable materials or equipment, or failure to adhere to the Baseline Schedule)**

Contractor's claim that it requires additional details regarding its failure to provide skilled workers, provide suitable materials or equipment or to adhere to the Baseline Schedule is hard to understand given the information in Contractor's possession.   If anything, this claim only further highlights Contractor's lack of competence with respect to the Project.

As Contractor is well aware, throughout the Project to date, Contractor failed to supply suitable materials and award critical subcontracts, causing substantial delays to the Project.   Examples of such delays include:

> a. Miscellaneous steel procurement and sequencing issues caused multiple crews to delay installing PCRs and pulpits (ongoing);
> b. Late award (not awarded to date) of fire protection subcontract (ongoing);
> c. Late Award of HVAC subcontracts (ongoing); and
> d. Late procurement of cooling bed trench pipe (ongoing).

Contractor is also aware of the significant staffing issues on the Project.   For instance, in October 2021, Contractor's Construction Manager became unable to work and Contractor failed to provide a competent replacement until February 22, 2022.   Contractor also failed to replace an incompetent Construction Manager between December 9, 2021 and February 28, 2022, leaving this critical role unfilled.   (*See* PAL_WAN_LT-0048.)   Contractor's staffing failures resulted in lack of coordination and control over its subcontractors and the work.

The fact is, as has been pointed out to Contractor multiple times, Contractor has never provided the level of manpower or staffing that the parties agreed to at the kick-off stage of the Project.  Indeed, between July 2021 and October 2021, Contractor provided less than half of the Concrete and Civil Manpower that was planned at kick-off and still has not fully staffed that aspect of the Project.  Likewise, Contractor has provided less than a quarter of the manpower required for "Mechanical" and "Piping."

As to the Baseline Schedule, since the parties executed the Contract in May 2021, Contractor has flouted its deadlines and failed to meet key milestones, causing substantial delays to the Project.  The Contract clearly requires that Contractor bears full responsibility to remedy delays in its progress.  (Article 21.1 (b), (d) and (e).)  Despite having no obligation to accommodate Contractor's failures, in February 2022, Owner accepted a modified Baseline Schedule extending Contractor's missed deadlines. Even with this generous accommodation, Contractor once again fell behind the Baseline Schedule by May 2022. (*See* Attachment 1.) Rather than work with Owner to move the Project forward, Contractor has unreasonably attempted to blame Owner for Contractor's failures and sought improper Change Proposals to further extend the Baseline Schedule to accommodate its delays.  Such further delays are not appropriate and cannot be accommodated.

2. **Article 29.2 (v): Contractor's failure to provide a Recovery Schedule as required pursuant to Section 20.1, or (ii) Contractor's failure, in Owner's reasonable opinion, to make required progress against a Recovery Schedule pursuant to Section 20.1(d)**

Contractor appears to concede that it has not honored its obligation to provide a Recovery Schedule pursuant to Article 20.1 and, instead, has submitted only a reforecasted schedule, which does not satisfy its contractual obligations.  As Contractor is aware, Owner has made multiple requests for a Recovery Schedule that Contractor has simply ignored. For instance, on March 8, 2022, Contractor forecasted slippage of the mechanical completion date from May 26, 2023 to June 6, 2023.  On March 8, Owner requested that Contractor provide a Recovery Schedule to address this slippage.  (PAL_WAN_LT-0072.)  Contractor declined to provide a Recovery Schedule, claiming that it would bring the mechanical completion date back to being forecast for June 2023.  (Contractor Notice #0036, March 19, 2022.)

Despite this promise, Contractor continued to report schedule slippage and, in August 2022, unilaterally began to prepare a reforecast of the work rather than submit a Recovery Schedule. (Contractor Notice #0086, August 9, 2022.)  On August 15, Owner rejected Contractor's plan to reforecast the work and reiterated its request that Contractor provide a Recovery Schedule pursuant to its obligations under the Contract.  (PAL_WAN_LT-0148.) Contractor refused to provide a Recovery Schedule and insisted on proceeding with a reforecast of the schedule.  (Contractor Notice #0100, August 23, 2022; Contractor Notice Letter #0113, September 1, 2022.) On September 13, Contractor provided its unauthorized reforecasted schedule setting the mechanical completion date in February 2024, which was a year after the original mechanical completion date.  (Contractor Notice #0119, September 13, 2022).

Additionally, on October 28, 2022, Owner submitted a Notice of Progress Measurement Deficiency in an attempt to assess and measure actual progress in progress as reported in its schedule.  (Contractor Notice #156, PAL_WAN_LT-0194.)  Contractor's response to Notice

#156 refuses to participate in a complete progress assessment until "all conversion packages are complete" and frustrates Owner's attempt to ascertain actual schedule progress.

Owner further rejects Contractor's claim that it cannot prepare a Recovery Schedule without a complete engineering design.  As Contractor is well aware, and as discussed above, the engineering design was substantially completed by February 2022 and Contractor has in its possession all design documents relevant to its scope of work.

3. **Article 29.2 (ix): Failure of Contractor to perform or otherwise to comply with a material term of this Agreement**

All of Contractor's failures identified in Owner's Notice of Default and in various correspondence to Contractor constitute breaches of the material terms of the Contract.  To the extent Contractor purports to require the specific provisions of the Contract that it has breached, such provisions include:

- Article 3.1 (Standards of Performance);
- Article 4.4 (Timeliness of Performance);
- Article 4.6 (Compliance with Recovery Schedules);
- Article 7.7 (On-site Safety Programs);
- Article 9.3 (Progress Reports);
- Article 20.1 (Recovery and Recovery Schedules);
- Article 26.1  (Record Documents);
- Appendix 1 (Schedule 1, Owner's Safety Manual);
- Appendix 3 (Project Controls);
- Appendix 6 (Quality Plan); and
- Appendix 7 (Health and Safety Management and Contractor's Site-Specific Safety Plan, submitted July 19, 2021).

The facts relating to these breaches are set forth in detail in Owner's December 21, 2022 Notice of Default, the correspondence cited therein and in this letter.

4. **Article 29.3 (xi): Contractor's, Subcontractor's or Supplier's repeated disregard of the authority of Owner or Owner's Representative**

Contractor has regularly disregarded Owner's authority by ignoring Owner's requests and directives.  As detailed in Owner's Notice of Default and in various correspondence to Contractor, Contractor has refused to respond to Owner's requests for Recovery Schedules, unilaterally submitted unauthorized reforecasted schedules, submitted improper Change Proposals and otherwise failed to comply with Owner's requests.  Contrary to Contractor's claim, Owner has raised multiple concerns directly and contemporaneously with Contractor, virtually all of which have gone unaddressed.

While Owner agrees that it is unfortunate that Contractor's breaches have come to a head so close to the end of the year and at a time when Colorado is currently suffering unexpected

weather conditions, Contractor's current situation is a direct result of its own conduct, delays and material breaches of the Contract.  Accordingly, if Contractor does not cure all of its breaches to Owner's satisfaction by December 31, 2022 in accordance with Article 29.2 of the Contract, Owner will declare Contractor in default and proceed with termination.

Owner expressly reserves all of its rights, remedies, claims, privileges, and protections it enjoys under the Contract, under the law and in equity without waiver or modification, including reserving all claims known or unknown and claims accrued to date.

Sincerely,

Matthew Perkins
EVP & Chief Performance Officer
Palmer NA, LLC

Cc:        Thomas Young, Ed Snatchko, Robert Blair, Talor Hall, Greg Vialpando, Robert Berry

           Mike McCurdy (Wanzek)

**ATTACHMENT 1**

## Analysis of Wanzek Schedule Dates for Key Milestones against Baseline Dates

| Wanzek Act. ID | Wanzek Activity Name | Current [DD 29-May-22] Finish | Baseline 13-Feb-22] Finish | Variance | | Current [DD 18-Dec-22] Finish | Variance To Baseline |
|---|---|---|---|---|---|---|---|
| **Palmer Rail Mill 2  - Wanzek P6 Schedules [Rec'd 6/01/22  7:42 PM and 12/21/22  5:55 PM]** | | | | | | | |
| **Guaranteed Milestones** | | | | | | | |
| M5--1150 | 4.4.bJ - Erect Cooling Bed Building (MBCB) Column Lines (51 - 40) - Structural | 8-Jun-22 | 27-May-22 | (12) | | 16-Dec-22 | (203) |
| M5--1040 | 4.4.bJI - Final Mechanical Completion - Palmer Rail Mill (5 Week Contractor Float) | 2-Jun-23 | 26-May-22 | (7) | | 19-Feb-24 | (269) |
| **Project Milestones** | | | | | | | |
| M5--1070 | KMS 01 - Cooling Bed (RMCB) Slab Pour #3 Foundation Complete (11/24/2021) | 22-Nov-21 | 22-Nov-21 | 0 | | 22-Nov-21 | 0 |
| M5--1100 | KMS 02 - Reheat Furnace (RMRF)Base Slab and Trench Foundations Complete (10/15/2021) | 28-Oct-21 | 28-Oct-21 | 0 | | 28-Oct-21 | 0 |
| M5--1080 | KMS 03 - Rail Service Center Building Foundations Complete | 23-Sep-22 | 23-Jun-22 | (92) | | 21-Apr-23 | (302) |
| M5--1090 | KMS 04 - Breakdown Mill (RMRB) Equipment Foundations Complete | 7-Sep-22 | 6-Sep-22 | (1) | | 23-Aug-22 | (351) |
| M5--1200 | KMS 05 - Zero Liquid Discharge (WTZL) Building Foundations Complete | 17-Oct-22 | 4-Nov-22 | 18 | | 31-May-23 | (208) |
| M5--1190 | KMS 06 - Water Treatment Plant (WTPL) Mechanical Equipment Installation Complete | 18-Nov-22 | 12-Dec-22 | 24 | | 9-Jan-24 | (393) |
| M5--1210 | KMS 07 - Ultra Flexible Reversing (UFR) (RMRU) Mechanical Equipment Install Complete | 28-Feb-23 | 21-Feb-23 | (7) | | 6-Feb-24 | (350) |
| M5--1220 | KMS 08 - Head Hardening Unit (HHU) (RMHH) Mechanical Complete | 23-Feb-23 | 22-Feb-23 | (1) | | 7-Feb-24 | (350) |
| M5--1130 | KMS 09 - NDT Suite Complete | 25-Apr-23 | 16-Feb-23 | (68) | | 11-Dec-23 | (298) |
| M5--1020 | KMS 10 - Weld Plant Mechanical Completion (Weld Line 1) | 26-Aug-22 | 26-Aug-22 | 0 | Same | 20-Feb-23 | (178) |
| **Client Milestones** | | | | | | | |
| M5--1370 | Hot Mill - RMRF - Concrete - 10" Slab On Grade Drain Trench West - F/R/P - KPI 2 | 25-Jul-22 | 18-May | (68) | | 9-Jun-23 | (387) |
| M5--1390 | Weld Plant - Mechanical Completion (Weld Line 1) - KPI 3.2 | 26-Aug-22 | 26-Aug-22 | 0 | Same | 20-Feb-23 | (178) |
| M5--1380 | Hot Mill - RMRU - Concrete - KPI 3.1 | 19-Sep-22 | 9-Sep | (10) | | 1-May-23 | (234) |
| M5--1400 | Hot Mill - RMRU - Major Equipment - Installation Complete - KPI 4 | 7-Dec-22 | 20-Dec | 13 | | 7-Jun-23 | (169) |

## Example: Schedule Adherence

### Schedule Data Date 22-May-22

**Activity Starts for Following Week**

| Planned | Actual | % |
|---|---|---|
| 15 | 6 | 40% |

**Activity Finishes for Following Week**

| Planned | Actual | % |
|---|---|---|
| 19 | 10 | 53% |

These Schedule Adherence numbers are typical for week-to-week progressing

EVRAZ North America   2100 S. Freeway   Pueblo, CO  81004   www.evrazna.com

# EXHIBIT C

 PALMER NORTH AMERICA

Matthew Perkins
EVP & Chief Performance Officer, Palmer N.A.
phone: (312) 533-3618
email:  matthew.perkins@evrazna.com

**December 31, 2022**                                             **PAL_WAN_LT-0214**



| | | |
|---|---|---|
| **Wanzek Construction Inc. Inc.** | **Wanzek Construction Inc.** | **Wanzek Construction** |
| c/o<br>Mark Bader-Hellstrom<br>Chief Operating Office<br>19316 Goddard Ranch Ct,<br>Morrison, CO 80465 | c/o<br>Mr. Arnie Jelinek<br>Executive Vice President<br>4850 32nd Ave. S<br>Fargo, ND 58104 | c/o<br>Legal Department<br><br>4850 32nd Ave. S<br>Fargo, ND 58104 |
| **Wanzek Construction, Inc. Inc.** | **Wanzek Construction Inc.** | **Guarantor:  Mas  Tec,** |
| c/o<br>Mark Baumann<br>Vice President Industrial<br>Mas Tec Industrial<br>6446 S. Kenton St. Suite 100<br>Centennial, CO 80111 | c/o<br>Bill Bradley<br>Senior Project Manager<br>Wanzek Construction, Inc.<br>6446 S. Kenton St. Suite 100<br>Centennial, CO 80111 | Attn:<br>General Counsel<br>800 Douglas Road,<br>Suite 1200<br>Coral Gables, FL<br>33134 |

**NOTICE:**      **DECLARATION OF DEFAULT AND NOTICE OF TERMINATION**
**Reference:**   **Contract Article 29.2, Article 36.5**
**Contract:**    **GC-01**

Messrs. Bader-Hellstrom, Jelinek, Baumann and Bradley:

This letter constitutes Palmer North America, LLC's ("Owner") declaration that Wanzek Construction, Inc. ("Contractor") is in default of the parties' contract dated May 14, 2021 (the "Contract") and provides notice that the Contract is hereby immeidately and irrevocably terminated.  (Articles 29.2(b).)

Contractor has failed to cure the instances of Contractor's default specifically identified in Owner's December 21, 2022 Notice of Default.  As set forth in the notice, Contractor's events of default include:

- Article 29.2 (i): Contractor's persistent failure to perform the Work in accordance with the Agreement (including failure to supply sufficient skilled workers or suitable materials or equipment, or failure to adhere to the Baseline Schedule);

- Article 29.2 (v): (i) Contractor's failure to provide a Recovery Schedule as required pursuant to Section 20.1, or (ii) Contractor's failure, in Owner's reasonable opinion, to make required progress against a Recovery Schedule pursuant to Section 20.1(d);


PALMER NORTH AMERICA

---

- Article 29.2 (ix): Failure of Contractor to perform or otherwise to comply with a material term of the Agreement; and

- Article 29.3 (xi): Contractor's, Subcontractor's, or Supplier's repeated disregard of the authority of Owner or Owner's Representative.

As a result of Contractor's failure to cure these events, Owner hereby declares Contractor to be in default and provides this written notice that the Contract is immediately terminated pursuant to Article 29.2(b) of the Contract. Owner expressly reserves any and all of its rights, remedies, claims, privileges, and protections under the Contract, under the law and in equity, without waiver or modification, as a result of Contractor's breaches and events of default, including reserving all claims known or unknown and claims accrued to date, regardless of whether they are specifically identified in prior written correspondence or in the legal action filed by Owner in the U.S. District Court in Colorado.

Sincerely,

Matthew Perkins
EVP & Chief Performance Officer
Palmer NA, LLC

Cc:    Thomas Young, Ed Snatchko, Robert Blair, Talor Hall, Greg Vialpando, Robert Berry
       Mike McCurdy (Wanzek)

# EXHIBIT D

## SECOND AMENDED
### PARTIAL RELEASE AND RESTATEMENT OF MECHANICS' LIEN
Sections 38-22-101 through 38-22-133, Colorado Revised Statutes

In accordance with Sections 38-22-101 through 38-22-133, Colorado Revised Statutes, **WANZEK CONSTRUCTION, INC.** ("Lien Claimant") makes the following Partial Release and Restatement of Mechanics' Lien, which further amends, and releases in part, the Amended and Restated Statement of Mechanic's Lien recorded at Reception No. 2300975 on January 6, 2023.

1. The names of the owner(s) or reputed owner(s) of the property to be affected by this Second Amended Statement of Mechanic's Lien (the "Lien") are **CF&I STEEL, LP; PALMER NORTH AMERICA, LLC; AND/OR EVRAZ ROCKY MOUNTAIN STEEL** (collectively, "Owner").

2. The name and mailing address of the Lien Claimant is **WANZEK CONSTRUCTION, INC.**, 4850 32nd Ave S., Fargo, North Dakota, 58104, Attention: Legal Department. ☐ a subcontractor, ☒ a principal contractor.

3. The name of the person who furnished the laborers, subcontractors or materials or performed the labor or services, or supplied the machinery, tools or equipment for which said Lien is claimed is **WANZEK CONSTRUCTION, INC.**

4. The name of the principal contractor is **WANZEK CONSTRUCTION, INC.**

5. The property to be affected by such Lien is described in **EXHIBIT A** attached hereto and incorporated herein by reference. The property is also known by the following addresses: 2100 South Freeway, Pueblo, CO 81004, and 100 Harlem Street, Pueblo, CO 81004.

6. The Mechanics' Lien is held for and on account of an unpaid balance owed by **PALMER NORTH AMERICA, LLC, EVRAZ ROCKY MOUNTAIN STEEL, AND/OR CF&I STEEL, LP**, to Lien Claimant.

7. This Second Amended Partial Release and Restatement of Mechanic's Lien changes only the <u>amount</u> claimed in the Amended and Restated Statement of Mechanic's Lien recorded on January 6, 2023, based on updating the amount due and owing and to account for interim payments by Owner. The net effect is a reduction of $415,238 in the claimed amount of the Lien.

8. Lien Claimant hereby amends its prior lien statement pursuant to Section 38-22-109(6), C.R.S. and, in doing so, releases its claim to $415,238 of the previously claimed lien amount.

9. Accordingly, the amount of indebtedness due or owing the Lien Claimant, for which said Lien is now claimed for laborers, subcontractors or material furnished, labor and services performed, or machinery, tools and equipment supplied is <u>**$64,222,426**</u>, together with interest thereon at the legal or agreed rate.

10. For clarity, this $64,222,426 amount amends and supersedes (and is not cumulative of) the amount previously claimed in the January 6, 2023, recording.[1]

WANZEK CONSTRUCTION, INC.
Lien Claimant

By: Arnold Jelinek
Its: Assistant Secretary/Authorized Representative

STATE OF NORTH DAKOTA
COUNTY OF CASS

I, Arnold Jelinek, being of lawful age and being first duly sworn upon oath, do say that I am the Assistant Secretary/Authorized Representative of the Lien Claimant herein named; that I have read the within Second Amended Partial Release and Restatement of Mechanic's Lien and know the contents thereof; and that the same is true and correct, to the best of my knowledge, information, and belief, and is made on behalf of the Lien Claimant.

Subscribed and sworn to before me in the County of Cass, State of North Dakota, this 20 day of April 2023.

Witness my hand and official seal

Notary Public
My commission expires: Aug 30th, 2025

DEBRA K. BUELOW
Notary Public
State of North Dakota
My Commission Expires Aug. 30, 2025

---

[1] This Second Amended Partial Release and Restatement of Mechanic's Lien is being re-recorded to correct, and reflect the title of Arnold Jelinek as Assistant Secretary/Authorized Representative of Wanzek Construction, Inc. The previously recorded instrument, recorded on April 19, 2023, as Instrument Number 2310083 in Pueblo County, incorrectly referenced Mr. Jelinek's title in the notary block.

## Exhibit A

Property Description

**Parcel No.: 1513400011**
**NE4 S2 13-21-65 CONTG 132.3A M/L NE4 + S2 EXC 15 FOLLOWING DESC TRACTS: 1) COMM AT W4 COR OF SEC 13, THN 89 DEG 31 MIN E, 88.00 FT; TH S 00 DEG 29 MIN E, 51.60 FT TO PT OF BEG AT INTER OF S LN OF MARYLAND AVE + E LN OF LAKE AVE EXTENDED; TH S 00 DEG 29 MIN E ALG E LN OF LAKE AVE EXTENDED 451.86 FT; TH N 89 DEG 31 MIN E, 133 FT; TH N 00 DEG 29 MIN W 451.86 FT TO PT ON S LN OF MARYLAND AVE; TH S 89 DEG 31 MIN W, ALG S L OF MARYLAND AVE 133.00 FT TO PT OF BEG CONTG 1.380A M/L; 2) COMM AT W4 COR OF SEC 13, TH S 00 DEG 29 MIN E, 51.60 FT TO PT ON S LN OF MARYLAND AVE EXTENDED; TH N 89 DEG 31 MIN E ALG S LN OF MARYLAND AVE 881.00 FT TO PT OF BEG; TH S 00 DEG 29 MIN E, 451.86 FT; TH N 89 DEG 31 MIN E, 1654.00 FT TO PT ON W LN OF TR CONVEYED TO ALBERT MIDDLEBROOK BY DEED BK 851 PG 371 PUEBLO COUNTY RECORDS; TH S 00 DEG 29 MIN E ALG W LN OF MIDDLEBROOK TR 456.50 FT, M/L TO PT ON NWLY LN OF TR CONVEYED TO CF+I CO BY DEED BK 293 PG 47  PUEBLO COUNTY RECORDS; TH NELY ALG NWLY LN OF LAST NAMED**

**Parcel No.: 1512420001**
**LOT 1 BLK 1 EVRAZ SUBDIVISION IN TAX DISTRICT 60BC FORMERLY # 15-124-00-004 & 005**

Also known as:

Parcel One:

A parcel of land located in Sections 6, 7, 18 and 19, Township 21 South, Range 64 West and Sections 12, 13, 24, 25 and 26, Township 21 South, Range 65 West of the 6th P.M., County of Pueblo, State of Colorado, also, portions of Lake Minnequa Addition, Amended, Minnequa Heights, Gateway Sub., and Harlem Sub., according to the recorded plats thereof, on file in the Pueblo County Clerk and Recorder's Office in Pueblo, Colorado, more particularly described as follows:

Commencing at the Northwest corner of Section 7;
Thence South 00°08'24" East perpendicular with Northern Avenue, a distance of 100 feet to a point on the South right-of-way line of Northern Avenue being the True Point of Beginning; Thence North 89°51'55" East along the said South line of Northern Avenue, a distance of 2544.24 feet;
Thence continuing Easterly along the Southerly right-of-way line of Northern Avenue, North 74°14' East, a distance of 95.07 feet;
Thence North 74°59' East, a distance of 102.48 feet; Thence North 69°29' East, a distance of 104.42 feet; Thence North 66°32' East, a distance of 102.16 feet;
Thence North 65°20' East, a distance of 696.34 feet to a point on the Southerly right-of-way line of the old Northern Avenue alignment;
Thence continuing along said Southerly right-of-way line, a bearing of North 69°56' East, a distance of 83.20 feet;
Thence North 75°57'30" East, a distance of 80.11 feet; Thence North 80°11' East, a distance of 27.22 feet; Thence North 80°53' East, a distance of 57.48 feet; Thence North 82°16'30" East, a distance of 59.28 feet;
Thence North 78°11'30" East, a distance of 43.49 feet to a point on the East line of the Southwest 1/4 of the Southeast 1/4 of Section 6, Township 21 South, Range 64 West;
Thence South 88°23'35" East, a distance of 429.57 feet to the Westerly right-of-way line of the Colorado and Southern Railway; Thence South 15°57'46" West along the said Westerly right-of-way, a distance of 487.35 feet to a point, which point is North 53°03'16" West, and a distance of 1,270.61 feet from the Northeast corner of Section 7, Township 21 South, Range 64 West, (Considering the South line of the Southeast 1/4 of Section 6 being North 88°21'08" West);
Thence North 74°02'23" West, a distance of 10.00 feet; Thence South 20°17'33" West, a distance of 169.85 feet;
Thence along an arc of a curve to the left, whose center bears South 68°50'05" East, a radius of 2,191.97 feet a distance of 102.82 feet;
Thence along an arc of a curve to the left with a radial bearing of South 71°31'20" East, a radius of 1,659.21 feet, a distance of 401.73 feet;
Thence South 85°23'41" East, a distance of 10.00 feet;
Thence along an arc of a curve to the left, which center bears South 85°23'41" East, a radius of 1,649.21 feet, a length of 558.76 feet;
Thence along an arc of a curve to the left which center bears North 75°11'35" East, a radius of 2,181.97 feet, an arc length of 102.35 feet;
Thence South 17°29'40" East, a distance of 50.00 feet; Thence South 72°30'20" West, a distance of 10.00 feet;

Thence South 17°29'40" East, a distance of 608.97 feet;

Thence along an arc of a curve to the right, which center bears South 72°30'20" West having a radius of 2,116.76 feet, a distance of 97.25 feet;

Thence South 75°08'17" West, a distance of 10.00 feet;

Thence along an arc of a curve to the right, which center bears South 75°08'17" West, having a radius of 1,562.87 feet, a distance of 704.37 feet;

Thence North 79°02'23" West, a distance of 10.00 feet;

Thence along an arc of a curve to the right, which center bears North 79°02'23" West, having a radius of 964.41 feet, a length of 474.25 feet;

Thence North 50°51'51" West, a distance of 10.00 feet;

Thence along an arc of a curve to the right, which center bears North 50°51'51" West, having a radius of 954.41 feet, a length of 510.41 feet;

Thence along an arc of a curve to the right, which center bears North 20°13'23" West, having a radius of 1,302.22 feet, a length of 93.55 feet;

Thence South 73°53'35" West, a distance of 50.00 feet; Thence South 16°06'24" East, a distance of 140.01 feet; Thence North 73°53'35" East, a distance of 479.55 feet;

Thence South 21°37'37" West, a distance of 2,720.81 feet to the South line of Section 7, Township 21 South, Range 64 West;

Thence South 89°05'59" East, along the South line of said Section 7, a distance of 26.73 feet; Thence South 21°37'37" West, a distance of 2,393.04 feet to a point on the East-West centerline of Section 18;

Thence South 82°11'26" East, a distance of 25.74 feet; Thence South 21°37'37" West, a distance of 957.23 feet;

Thence along an arc of a curve to the right, which center bears North 68°22'23" West, a radius of 7,539.48 feet and an arc length of 98.69 feet;

Thence along an arc of a curve to the right, whose center bears North 67°37'23" West, having a radius of 5,629.48 feet, a distance of 1,746.91 feet;

Thence along an arc of a curve to the right, which center bears North 49°50'38" West, having a radius of 7,539.48 feet, a distance of 28.18 feet to the South line of section 18;

Thence continuing along an arc of a curve to the right, which center bears North 49°36'47" West, having a radius of 7,539.48 feet, a distance of 68.31 feet;

Thence South 49°05'39" East, a distance of 25.00 feet;

Thence South 40°54'22" West, a distance of 1,462.18 feet to a point on the West line of section 19;

Thence South 00°15'14" West, along said West line of Section 19, a distance of 38.37 feet; Thence South 40°54'22" West, a distance of 1,713.48 feet;

Thence along a curve to the left, which center bears South 49°05'38" East, a radius of 2,596.61 feet and an arc length of 101.97 feet;

Thence along a curve to the left which center bears South 51°20'38" East, a radius of 1,960.08 feet and an arc length of 771.69 feet;

Thence South 16°05'56" West, a distance of 924.31 feet to a point on the Westerly right-of-way fence of the Southern Pacific Railroad (Denver & Rio Grande Western Railroad);

Thence South 03°17'04" West, along said fence being a distance of 141.80 feet West and parallel of the centerline of the Southbound tracks, a distance of 3,653.92 feet to a point, said point being North 31°34'10" West, a distance of 3,708.89 feet from the Southeast corner of Section 25, Township 21 South, Range 65 West;

Thence North 90°00'00" West, a distance of 5,270.40 feet to a point, being the Southeast corner of "C&W Industrial Area" as recorded in Book 1750 at Page 174 of the Pueblo County Clerk and Recorder's Office;

Thence along the Easterly boundary of said C&W Industrial Area, North 25°19'17" East, a distance of 11,221.33 feet to the Easterly right-of-way line of Interstate Highway I-25; Thence North 39°23'38" East, a distance of 616.40 feet to the Southeast corner of Lot 14, Block 31, Minnequa Heights Addition;

Thence North 25°04'41" East, a distance of 454.47 feet; Thence North 02°52'36" East, a distance of 864.99 feet;

Thence along a curve to the left of said Easterly right-of-way line of I-25, having a radius of 3,880.00 feet and an arc length of 275.5 feet and chord bearing North 01°51'41" East, a distance of 275.40 feet;

Thence North 00°13'41" East, a distance of 134.70 feet to a point on the Southerly line produced Westerly of a 10.00 acre tract of land conveyed to the Steel Wheel and Wagon Company by the Minnequa Town Company recorded in Book 239 at Page 85 of the Pueblo County Clerk **and** Recorder's Office;

Thence continuing along the Easterly right-of-way line of said I-25, North 00°32'18" West, a distance of 684.37 feet;

Thence North 06°22'41" East, a distance of 361.10 feet to the North line of Section 13, Township 21 South, Range 65 West;

Thence North 00°34'19" East along the West line of Block 39 of Lake Minnequa Addition, amended, a distance of 239.50 feet;

Thence along a curve to the right with a radius of 2,367.0 feet, a length of 478.11 feet and a chord bearing of North 19°09'03" East, a distance of 477.30 feet;

Thence North 60°34'19" West, a distance of 97.12 feet; Thence North 06°40'41" East, a distance of 153.40 feet;

Thence along a curve to the right having a radius of 1,402.50 feet and arc length of 157.90 feet and a chord bearing of North 09°54'01" East, a distance of 157.80 feet;

Thence North 13°10'14" East, a distance of 201.04 feet to the North line of Block 25, Lake Minnequa Addition, Amended;

Thence leaving the Easterly right-of-way line of I-25, North 89°25'14" East along the North line of said Block 25, a distance of 368.55 feet to the Northeast corner of said Block 25;

Thence continuing North 89°25'41" East across the Denver **and** Rio Grande Railroad right-of- way, a distance of 100.00 feet;

Thence North 00°08'26" East along the Easterly line of said right-of-way of the D & R G Railroad, a distance of 3,937.29 feet to the South line of Northern Avenue;

Thence North 89°51'36" East, a distance of 1,242.04 feet to the True Point of Beginning, County of Pueblo, State of Colorado.

Excepting therefrom, the following tracts of land and tax parcel numbers:

1. Evraz Subdivision per the plat recorded December 6, 2021 at Reception No. 2255260
2. That land described in Book 239 at Page 85
3. The following Books and Pages and/or Reception numbers of Deeds from CF&I Steel to others recorded subsequent to the Deed into CF&I Steel in Book 2642 at Page 146 and in Book 2737 at Page 49: Book 2837, Page 902; Book 2853, Page 804; Book 3004 at Page 221; Reception No. 1431224-2002; Reception No. 1474704-2002; Reception No. 1814484-2009;

4.   The following Books and Pages as conveyed to the Denver & Rio Grande Railway Company:  Book 3, Page 708 (in Section 6); Book 18, Page 22 (Sections 12, 13, 24); Book 18, Page 535 (Section 12); Book 18, Page 569 (illegible); Book 28, Page 289 (Section 6); Book 28, Page 291 (Section 6); Book 49, Page 192 (Section 6); Book 154, Page 330 (Section 7);

5.   The following Books and Pages as conveyed to The Denver, Texas and Ft. Worth Railroad:  Book 69, Page 420 (Section 6);

6.   The following Books and Pages as conveyed to the County of Pueblo:  Book 243, Page 29 (Sections 6, 7 and 18); Book 273, Page 189 (Sections 7 and 18);

7.   The following Books and Pages as conveyed to the Colorado and Wyoming Railway Company:  Book 248, Page 377 (Sections 6, 7, 18); Book 381, Page 13;

8.   The following Books and Pages as conveyed to the Colorado and Southern Railway Company:  Book 371, Page 623 (Section 7); Book 371, Page 626 (Section 7); Book 371, Page 627 (Section 18); Book 371, Page 629 (Section 7); Book 371, Page 631 (Sections 7 and 18);

9.   The following Books and Pages as conveyed to the Atchison, Topeka and Santa Fe Railway Company:  Book 381, Page 24 (Section 7); Book 381, Page 26 (Section 7); Book 381, Page 28 (Section 18); Book 381, Page 30 (Section 7);

10.   Tax Parcel No. 1400000087

11.   Tax Parcel No. 1400000138

12.   Tax Parcel No. 1406000023

13.   Tax Parcel No. 1406000095

14.   Tax Parcel No. 1406000117

15.   Tax Parcel No. 1407000009

16.   Tax Parcel No. 1512419002


Parcel Two:

Lot 1,
Block 1,
Evraz Subdivision,
as per the plat thereof recorded December 6, 2021 at Reception No. 2255260, County of Pueblo, State of Colorado

Note:  For informational purposes only, Parcel Two is covered by tax parcel no. 1512420001.

# EXHIBIT E

| DEFENDANT | INSTRUMENT | DOCUMENT RECORDING DATE | AMOUNT | RECEPTION NO. |
|---|---|---|---|---|
| Southern Industrial Contractors, L.L.C. | Statement of Mechanic's Lien | February 21, 2023 | $2,707,316.10 | 2304847 |
| Western Oilfields Supply Company dba Rain for Rent | Statement of Mechanic's Lien | April 6, 2023 | $14,329.18 | 2308952 |
| Penhall Company | Statement of Lien | February 16, 2023 Re-recorded same day | $120,510.50 | 2304690 2304693 |
| J.D. Steel CO, Inc. | Statement of Mechanic's Lien Amended Lien Statement | March 29, 2023 April 21, 2023 | $2,867,834.03 | 2308242 2310268 |
| Action Ready Mix, LLC | Statement of Lien | April 18, 2023 | $169,072.60 | 2310046 |
| Wagner Equipment Co. a/d/b/a Wagner Rents, Inc. | Statement of Lien Re-recorded | April 18, 2023 | $1,344,250.25 | 2310070 |
| Aviation Service Supply Company d/b/a AIS Industrial & Construction Supply | Statement of Lien | April 24, 2023 | $126,061.45 | 2310448 |
| RMD Kwikform NA | Statement of Lien | April 4, 2023 | $650,874.83 | 2308778 |
| Flow Right Plumbing & Irrrigation, Inc., and/or its controlled subsidiary, FRPHI Commercial Contracting, Inc. | Statement of Mechanic's Lien | January 23, 2023 | $18,238.07 | 2302475 |
| CMC Steel Fabricators dba CMC Rebar | Statement of Lien | February 16, 2023 | $1,841,981.14 | 2304445 |
| Core & Main LP | Notice Extending Time to File Mechanic's Lien Statement | March 22, 2023 | Not listed | 2307633 |
| City of Pueblo, Colorado | Deed of Trust | December 17, 2020 | $15,000,000.00 | 2205247 |

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-03290-CNS-MBD

PALMER NORTH AMERICA LLC,

      Plaintiff,

v.

WANZEK CONSTRUCTION, INC., and
MASTEC, INC.,

      Defendants.

_____

WANZEK CONSTRUCTION, INC.,

      Counterclaim Plaintiff,

v.

PALMER NORTH AMERICA LLC; CF&I
STEEL, L.P. d/b/a EVRAZ ROCKY MOUNTAIN
STEEL, a Delaware limited partnership;
SOUTHERN INDUSTRIAL CONTRACTORS,
L.L.C., a Louisiana limited liability company;
WESTERN OILFIELDS SUPPLY COMPANY
dba RAIN FOR RENT, a Delaware corporation;
PENHALL COMPANY, a California corporation;
J.D. STEEL CO., INC., an Arizona corporation;
ACTION READY MIX, LLC, a Colorado limited
liability company; WAGNER EQUIPMENT CO.
a/d/b/a WAGNER RENTS, INC., a Colorado
corporation; AVIATION SERVICE SUPPLY
COMPANY d/b/a AIS INDUSTRIAL &
CONSTRUCTION SUPPLY, a Colorado
corporation; RMD KWIKFORM, NA, a Delaware
corporation; FLOW RIGHT PLUMBING
HEATING & IRRIGATION, INC. through its
controlled subsidiary, FRPHI COMMERCIAL
CONTRACTING, INC., a Colorado corporation;

CMC STEEL FABRICATORS d/b/a CMC REBAR, a Delaware corporation; CORE & MAIN LP, a Florida Limited Partnership; CITY OF PUEBLO, COLORADO, a Colorado Municipal Corporation; and DOUGLAS NAYLON as PUBLIC TRUSTEE OF PUEBLO COUNTY, COLORADO.

     Counterclaim Defendant.

_____

WANZEK CONSTRUCTION, INC.,

     Third-Party Plaintiff,

v.

EVRAZ NORTH AMERICA PLC,

     Third-Party Defendant.

_____

## NOTICE OF *LIS PENDENS*

_____

NOTICE is hereby given pursuant to § 38-22-110, C.R.S. that Defendant Wanzek Construction, Inc., a North Dakota corporation, has been named in the above-referenced federal lawsuit wherein relief in the form of foreclosure of a mechanic's lien is claimed affecting the title to the following real property, as described in **Exhibit A**, attached herein.

Respectfully submitted and dated May 26, 2023.

Dated:     May 26, 2023                    Respectfully submitted,


                                           */s/ Bret Gunnell*
                                           Bret Gunnell (#24579)
                                           Henry Bangert (#37909)
                                           Beltzer Bangert and Gunnell LLP
                                           5420 S. Quebec Street, Suite 103
                                           Greenwood Village, CO 80111
                                           Telephone: (720) 576-7225
                                           E-mail: bret@bbglaw.com
                                           E-mail: henry@bbglaw.com

                                           Michael P. Subak (Admitted D. Colo)
                                           Jamey B. Collidge (Admitted D. Colo)
                                           3000 Two Logan Square
                                           Eighteen and Arch Streets
                                           Philadelphia, PA 19103
                                           Telephone:  (215) 981-4000
                                           E-mail: Michael.Subak@troutman.com
                                           E-mail: Jamey.Collidge@troutman.com

                                           *Attorneys for Defendant, Counterclaimant, and*
                                           *Third-Party Plaintiff Wanzek Construction, Inc.;*
                                           *and Defendant MasTec, Inc.*


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 26, 2023, a true and correct copy of the foregoing was served on ALL COUNSEL OF RECORD through the court e-filing system.

                                           */s/ Rhonda Rudolph*
                                           Rhonda Rudolph

**Exhibit A**
Property Description

**Parcel No.:  1513400011**
**NE4 S2 13-21-65 CONTG 132.3A M/L NE4 + S2 EXC 15 FOLLOWING DESC TRACTS:
1) COMM AT W4 COR OF SEC 13, THN 89 DEG 31 MIN E, 88.00 FT; TH S 00 DEG 29
MIN E, 51.60 FT TO PT OF BEG AT INTER OF S LN OF MARYLAND AVE + E LN OF
LAKE AVE EXTENDED; TH S 00 DEG 29 MIN E ALG E LN OF LAKE AVE EXTENDED
451.86 FT; TH N 89 DEG 31 MIN E, 133 FT; TH N 00 DEG 29 MIN W 451.86 FT TO PT
ON S LN OF MARYLAND AVE; TH S 89 DEG 31 MIN W, ALG S L OF MARYLAND
AVE 133.00 FT TO PT OF BEG CONTG 1.380A M/L; 2) COMM AT W4 COR OF SEC 13,
TH S 00 DEG 29 MIN E, 51.60 FT TO PT ON S LN OF MARYLAND AVE EXTENDED;
TH N 89 DEG 31 MIN E ALG S LN OF MARYLAND AVE 881.00 FT TO PT OF BEG; TH
S 00 DEG 29 MIN E, 451.86 FT; TH N 89 DEG 31 MIN E, 1654.00 FT TO PT ON W LN OF
TR CONVEYED TO ALBERT MIDDLEBROOK BY DEED BK 851 PG 371 PUEBLO
COUNTY RECORDS; TH S 00 DEG 29 MIN E ALG W LN OF MIDDLEBROOK TR
456.50 FT, M/L TO PT ON NWLY LN OF TR CONVEYED TO CF+I CO BY DEED BK
293 PG 47 PUEBLO COUNTY RECORDS; TH NELY ALG NWLY LN OF LAST NAMED**

**Parcel No.:  1512420001**
**LOT 1 BLK 1 EVRAZ SUBDIVISION IN TAX DISTRICT 60BC FORMERLY # 15-124-
00-004 & 005**

Also known as:

**Parcel One:**

A parcel of land located in Sections 6, 7, 18 and 19, Township 21 South, Range 64 West and
Sections 12, 13, 24, 25 and 26, Township 21 South, Range 65 West of the 6th P.M., County of
Pueblo, State of Colorado, also, portions of Lake Minnequa Addition, Amended, Minnequa
Heights, Gateway Sub., and Harlem Sub., according to the recorded plats thereof, on file in the
Pueblo County Clerk and Recorder's Office in Pueblo, Colorado, more particularly described as
follows:

Commencing at the Northwest corner of Section 7;
Thence South 00°08'24" East perpendicular with Northern Avenue, a distance of 100 feet to a point
on the South right-of-way line of Northern Avenue being the True Point of Beginning; Thence
North 89°51'55" East along the said South line of Northern Avenue, a distance of 2544.24 feet;
Thence continuing Easterly along the Southerly right-of-way line of Northern Avenue, North
74°14' East, a distance of 95.07 feet;
Thence North 74°59' East, a distance of 102.48 feet; Thence North 69°29' East, a distance of 104.42
feet; Thence North 66°32' East, a distance of 102.16 feet;
Thence North 65°20' East, a distance of 696.34 feet to a point on the Southerly right-of-way line
of the old Northern Avenue alignment;
Thence continuing along said Southerly right-of-way line, a bearing of North 69°56' East, a
distance of 83.20 feet;

Thence North 75°57'30" East, a distance of 80.11 feet; Thence North 80°11' East, a distance of 27.22 feet; Thence North 80°53' East, a distance of 57.48 feet; Thence North 82°16'30" East, a distance of 59.28 feet;

Thence North 78°11'30" East, a distance of 43.49 feet to a point on the East line of the Southwest 1/4 of the Southeast 1/4 of Section 6, Township 21 South, Range 64 West;

Thence South 88°23'35" East, a distance of 429.57 feet to the Westerly right-of-way line of the Colorado and Southern Railway;

Thence South 15°57'46" West along the said Westerly right-of-way, a distance of 487.35 feet to a point, which point is North 53°03'16" West, and a distance of 1,270.61 feet from the Northeast corner of Section 7, Township 21 South, Range 64 West, (Considering the South line of the Southeast 1/4 of Section 6 being North 88°21'08" West);

Thence North 74°02'23" West, a distance of 10.00 feet; Thence South 20°17'33" West, a distance of 169.85 feet;

Thence along an arc of a curve to the left, whose center bears South 68°50'05" East, a radius of 2,191.97 feet a distance of 102.82 feet;

Thence along an arc of a curve to the left with a radial bearing of South 71°31'20" East, a radius of 1,659.21 feet, a distance of 401.73 feet;

Thence South 85°23'41" East, a distance of 10.00 feet;

Thence along an arc of a curve to the left, which center bears South 85°23'41" East, a radius of 1,649.21 feet, a length of 558.76 feet;

Thence along an arc of a curve to the left which center bears North 75°11'35" East, a radius of 2,181.97 feet, an arc length of 102.35 feet;

Thence South 17°29'40" East, a distance of 50.00 feet; Thence South 72°30'20" West, a distance of 10.00 feet;

Thence South 17°29'40" East, a distance of 608.97 feet;

Thence along an arc of a curve to the right, which center bears South 72°30'20" West having a radius of 2,116.76 feet, a distance of 97.25 feet;

Thence South 75°08'17" West, a distance of 10.00 feet;

Thence along an arc of a curve to the right, which center bears South 75°08'17" West, having a radius of 1,562.87 feet, a distance of 704.37 feet;

Thence North 79°02'23" West, a distance of 10.00 feet;

Thence along an arc of a curve to the right, which center bears North 79°02'23" West, having a radius of 964.41 feet, a length of 474.25 feet;

Thence North 50°51'51" West, a distance of 10.00 feet;

Thence along an arc of a curve to the right, which center bears North 50°51'51" West, having a radius of 954.41 feet, a length of 510.41 feet;

Thence along an arc of a curve to the right, which center bears North 20°13'23" West, having a radius of 1,302.22 feet, a length of 93.55 feet;

Thence South 73°53'35" West, a distance of 50.00 feet; Thence South 16°06'24" East, a distance of 140.01 feet; Thence North 73°53'35" East, a distance of 479.55 feet;

Thence South 21°37'37" West, a distance of 2,720.81 feet to the South line of Section 7, Township 21 South, Range 64 West;

Thence South 89°05'59" East, along the South line of said Section 7, a distance of 26.73 feet; Thence South 21°37'37" West, a distance of 2,393.04 feet to a point on the East-West centerline of Section 18;

Thence South 82°11'26" East, a distance of 25.74 feet; Thence South 21°37'37" West, a distance

of 957.23 feet;

Thence along an arc of a curve to the right, which center bears North 68°22'23" West, a radius of 7,539.48 feet and an arc length of 98.69 feet;

Thence along an arc of a curve to the right, whose center bears North 67°37'23" West, having a radius of 5,629.48 feet, a distance of 1,746.91 feet;

Thence along an arc of a curve to the right, which center bears North 49°50'38" West, having a radius of 7,539.48 feet, a distance of 28.18 feet to the South line of section 18;

Thence continuing along an arc of a curve to the right, which center bears North 49°36'47" West, having a radius of 7,539.48 feet, a distance of 68.31 feet;

Thence South 49°05'39" East, a distance of 25.00 feet;

Thence South 40°54'22" West, a distance of 1,462.18 feet to a point on the West line of section 19;

Thence South 00°15'14" West, along said West line of Section 19, a distance of 38.37 feet; Thence South 40°54'22" West, a distance of 1,713.48 feet;

Thence along a curve to the left, which center bears South 49°05'38" East, a radius of 2,596.61 feet and an arc length of 101.97 feet;

Thence along a curve to the left which center bears South 51°20'38" East, a radius of 1,960.08 feet and an arc length of 771.69 feet;

Thence South 16°05'56" West, a distance of 924.31 feet to a point on the Westerly right-of-way fence of the Southern Pacific Railroad (Denver & Rio Grande Western Railroad);

Thence South 03°17'04" West, along said fence being a distance of 141.80 feet West and parallel of the centerline of the Southbound tracks, a distance of 3,653.92 feet to a point, said point being North 31°34'10" West, a distance of 3,708.89 feet from the Southeast corner of Section 25, Township 21 South, Range 65 West;

Thence North 90°00'00" West, a distance of 5,270.40 feet to a point, being the Southeast corner of "C&W Industrial Area" as recorded in Book 1750 at Page 174 of the Pueblo County Clerk and Recorder's Office;

Thence along the Easterly boundary of said C&W Industrial Area, North 25°19'17" East, a distance of 11,221.33 feet to the Easterly right-of-way line of Interstate Highway I-25; Thence North 39°23'38" East, a distance of 616.40 feet to the Southeast corner of Lot 14, Block 31, Minnequa Heights Addition;

Thence North 25°04'41" East, a distance of 454.47 feet; Thence North 02°52'36" East, a distance of 864.99 feet;

Thence along a curve to the left of said Easterly right-of-way line of I-25, having a radius of 3,880.00 feet and an arc length of 275.5 feet and chord bearing North 01°51'41" East, a distance of 275.40 feet;

Thence North 00°13'41" East, a distance of 134.70 feet to a point on the Southerly line produced Westerly of a 10.00 acre tract of land conveyed to the Steel Wheel and Wagon Company by the Minnequa Town Company recorded in Book 239 at Page 85 of the Pueblo County Clerk **and** Recorder's Office;

Thence continuing along the Easterly right-of-way line of said I-25, North 00°32'18" West, a distance of 684.37 feet;

Thence North 06°22'41" East, a distance of 361.10 feet to the North line of Section 13, Township 21 South, Range 65 West;

Thence North 00°34'19" East along the West line of Block 39 of Lake Minnequa Addition, amended, a distance of 239.50 feet;

Thence along a curve to the right with a radius of 2,367.0 feet, a length of 478.11 feet and a chord

bearing of North 19°09'03" East, a distance of 477.30 feet;

Thence North 60°34'19" West, a distance of 97.12 feet; Thence North 06°40'41" East, a distance of 153.40 feet;

Thence along a curve to the right having a radius of 1,402.50 feet and arc length of 157.90 feet and a chord bearing of North 09°54'01" East, a distance of 157.80 feet;

Thence North 13°10'14" East, a distance of 201.04 feet to the North line of Block 25, Lake Minnequa Addition, Amended;

Thence leaving the Easterly right-of-way line of I-25, North 89°25'14" East along the North line of said Block 25, a distance of 368.55 feet to the Northeast corner of said Block 25;

Thence continuing North 89°25'41" East across the Denver **and** Rio Grande Railroad right-of- way, a distance of 100.00 feet;

Thence North 00°08'26" East along the Easterly line of said right-of-way of the D & R G Railroad, a distance of 3,937.29 feet to the South line of Northern Avenue;

Thence North 89°51'36" East, a distance of 1,242.04 feet to the True Point of Beginning, County of Pueblo, State of Colorado.

Excepting therefrom, the following tracts of land and tax parcel numbers:

Evraz Subdivision per the plat recorded December 6, 2021 at Reception No. 2255260

That land described in Book 239 at Page 85

The following Books and Pages and/or Reception numbers of Deeds from CF&I Steel to others recorded subsequent to the Deed into CF&I Steel in Book 2642 at Page 146 and in Book 2737 at Page 49:  Book 2837, Page 902; Book 2853, Page 804; Book 3004 at Page 221; Reception No. 1431224-2002; Reception No. 1474704-2002; Reception No. 1814484-2009;

The following Books and Pages as conveyed to the Denver & Rio Grande Railway Company: Book 3, Page 708 (in Section 6); Book 18, Page 22 (Sections 12, 13, 24); Book 18, Page 535 (Section 12); Book 18, Page 569 (illegible); Book 28, Page 289 (Section 6); Book 28, Page 291 (Section 6); Book 49, Page 192 (Section 6); Book 154, Page 330 (Section 7);

The following Books and Pages as conveyed to The Denver, Texas and Ft. Worth Railroad: Book 69, Page 420 (Section 6);

The following Books and Pages as conveyed to the County of Pueblo: Book 243, Page 29 (Sections 6, 7 and 18); Book 273, Page 189 (Sections 7 and 18);

The following Books and Pages as conveyed to the Colorado and Wyoming Railway Company: Book 248, Page 377 (Sections 6, 7, 18); Book 381, Page 13;

The following Books and Pages as conveyed to the Colorado and Southern Railway Company: Book 371, Page 623 (Section 7); Book 371, Page 626 (Section 7); Book 371, Page 627 (Section 18); Book 371, Page 629 (Section 7); Book 371, Page 631 (Sections 7 and 18);

The following Books and Pages as conveyed to the Atchison, Topeka and Santa Fe Railway Company:  Book 381, Page 24 (Section 7); Book 381, Page 26 (Section 7); Book 381, Page 28 (Section 18); Book 381, Page 30 (Section 7);

Tax Parcel No. 1400000087

Tax Parcel No. 1400000138

Tax Parcel No. 1406000023

Tax Parcel No. 1406000095
Tax Parcel No. 1406000117
Tax Parcel No. 1407000009
Tax Parcel No. 1512419002

**Parcel Two:**

Lot 1,
Block 1,
Evraz Subdivision,
as per the plat thereof recorded December 6, 2021 at Reception No. 2255260, County of Pueblo,
State of Colorado

**Note:  For informational purposes only, Parcel Two is covered by tax parcel no. 1512420001.**